[Crim. No. 23642. First Dist., Div. Four. Feb. 9, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
BYRON MARTIN PEPPARS, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

---

**COUNSEL**

Mark S. Rudy, under appointment by the Court of Appeal, and Bushnell, Caplan, Fielding & Rudy for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, William D. Stein, Assistant Attorney General, W. Eric Collins and David D. Salmon, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

POCHÉ, J.—Byron Martin Peppars appeals from a judgment of conviction entered upon a jury verdict finding him guilty of conspiracy to commit second degree burglary. (Pen. Code, §§ 182, 459.)[2] The judgment is affirmed.

*Facts*

Appellant and his brother, Damon Elliott Peppars, were charged by a two count amended information: conspiracy to commit burglary (count I); and attempted burglary (count II). Also charged in count II, and tried with appellant and Damon, was Darryl Demingos Lee. The jury returned a guilty verdict as to appellant on the conspiracy charge, and a not guilty verdict with respect to Lee on the attempted burglary charge. The jury was unable to reach a verdict as to Damon on both counts and as to appellant on the attempted burglary count; accordingly, the trial court declared a mistrial on those charges.

This appeal is directed only to appellant's conviction of conspiracy to commit second degree burglary.

*Prosecution's Case*

In May of 1981,[3] Sonoma County Sheriff's Deputy Roger Rude was assigned to work in an undercover capacity. On May 21, Rude met with Paul Johnson

---

[2]Unless otherwise indicated, all further statutory references are to the Penal Code.

[3]Unless otherwise indicated, all further dates are to the 1981 calendar year.

and appellant on Bellevue Avenue in Santa Rosa. Although Rude was wearing a transmitting device, no recording of this conversation was made. Rude testified that at this meeting the three men discussed a wedding ring which Rude was going to sell for appellant. At some point the subject changed: appellant asked Rude if he knew of a warehouse to "rip off."

Rude met with appellant and Johnson again at the same location on May 29, at about 9 a.m. This conversation was recorded and can be summarized as follows:

Rude informed appellant and Johnson that he had learned of a warehouse that he could get them into: "[I]t'll just be a matter of walkin in, loadin up and walkin out. No break in, no alarms or nothin." Rude asked appellant, "remember the last time we got together you were, uh, talked to me that you said you, uh, you might have some folks who could do somethin?" Appellant responded, "Yeah, yeah, I talked to em about, what kinda place is it?" Rude explained that he knew of a former employee who had keys to a warehouse "full of . . . stereo equipment, . . . t.v.s and video recorders . . . what happened was he got canned, they didn't know he made a set of duplicate keys, . . . and, uh, if I purchase the keys, they should get us into the building . . . ." Appellant asked if there was an alarm on the building system. Rude replied that he did not have all the facts, but he understood that if there were an alarm system that he could get the key to that also. Appellant responded, "O.K." Appellant asked where it was, Rude responded, "Santa Rosa." Appellant responded, "sortova good." Rude stated that he had not yet seen the warehouse and had not yet purchased the keys, but that he wanted to "make sure that I had you on this end to deal this with and then I could go ahead and do it." Appellant responded, "You know, well all I need now is just, you know, just to know all the information about it." Rude replied that he would get the information and the keys to the building. Johnson asked him to find out whether there was a security guard, and Rude said that he would. Rude said that he understood it was an overflow warehouse used to store the merchandise for a short period of time and not heavily secured. Because it was such, Rude stated that when he got the keys they would probably have to move quickly. Appellant responded that he would need at least a day's notice to "get everything lined up." Rude said he would do that, because he needed time to "line up" on his end: "I'll be able to find out what's inside and I should be able to have the buyers lined up and the whole bit."

Appellant raised the question of transportation: he thought that a car would not "cut it" and that a panel pickup or a U-Haul truck would be needed. He suggested that he could rent one, and "I have a cover for myself, you know, in

case anything goes, goes wrong . . . and I can just say that [it] was stolen." Rude agreed, and said that he could set it up so that appellant would not have to "hang onto the stuff . . . I should be able to line up buyers . . . and have a pick up and have it a delivery and get that stuff marketed and get the fuck out." Appellant responded, "Yeah, that's cool" and "sounds good."

Rude said that he should be able to get back in touch with them the beginning of the following week, and asked for appellant's telephone number. Appellant said that he was in the process of moving and gave him the telephone "here at Bev's." Johnson interjected that he wanted a 19-inch color portable television set and a video recorder, if it goes with it, as his "pay off." Rude said, "O.K."

Appellant then asked Rude about trying to find a buyer for a ring that appellant had. Appellant suggested that Rude take the ring with him and show it to his potential buyers. Rude agreed and said that he would return if he could not find a buyer by the time he got the keys to the warehouse. Appellant asked Rude for a telephone number where he could be reached. Johnson said that he had it, but had misplaced it. Rude said he could not remember the number of the "crash pad" where he could get the message, but promised to call appellant later that day with the number.

After further conversation, Rude promised to get back to appellant about the ring by the next day and that he would call about the warehouse. Appellant told Rude that he first wanted to "go out and see the place." Rude said that he would get the location and call appellant so that he could look at the warehouse. Appellant responded that by seeing the place, he could "tell the fellas, about, you know," and see "which is the best way to go in and which is the best way to go out." He also assured Rude that he was not going to "burn" him. Rude said that he would get started on his end, and Johnson reminded him to "check out the security guards." Rude said that he would go ahead and buy the keys, talk to the employee and find out as much as he could and get back in touch. Appellant responded, "Yeah, I'd like to do this, you know, set it all up . . . so we can take it, man, just go on do it and get out of there."

Rude telephoned appellant later that afternoon at about 4:10 p.m. Rude told appellant that he was "linin up . . . the warehouse thing" and that he should be able to get the location and the keys by the following Monday (June 1). Appellant asked if it could be arranged sooner than that, and Rude said no. Rude also told appellant that he thought he had a buyer for the ring for $800.

After further conversation, appellant said there was no problem with the Monday date; the "main thing" was for it to be set up and for him to "check it out." Appellant reiterated he had the people "that can do it" and commented that it would be "money in both of our hands." Rude told appellant that by the

time he did his "thing" he would have the cash so he could take the property out of appellant's hands and that it should "work real smooth." Appellant replied it was a good idea, and Rude agreed to telephone him the following Monday. The conversation concluded with appellant talking to someone in the background, "Roger [Rude] ain't the police, if he's the police I'm the pope."

On Monday afternoon, June 1, Rude telephoned appellant at about 3:40 p.m. and told him he was going to get the keys to the warehouse the next day. Rude explained the man had told him that the warehouse should be "taken off" the following evening because afterwards the merchandise would be moved. He also said he had learned that the warehouse's electronic security system had been discontinued, and that the only security was a "rent-a-cop" who checked on the place at midnight. Rude suggested that they meet the following day at 2 p.m., at which time he would give him the keys and tell him the location. He also told appellant that he had arranged a place to meet him after the burglary "where you can just take the stuff straight there and get rid of it." Rude promised he would give appellant the money for the ring at that time. Appellant commented he was "desperate" for the money, and Rude said he would give it to him the following evening. Appellant suggested it would be better to "take it off" at night than during the daytime. Rude agreed.

Appellant later telephoned Rude to tell him that he could not make the 2 p.m. date on June 2. Rude returned his call at about 2:55. Appellant said he was waiting for him, and Rude promised to come over. Rude said he had the keys and a map of the warehouse and that "it should work out real well." Appellant said he did not have the $100 necessary to rent a truck. Rude said he would see what he could "scrounge up," suggested that appellant do the same, and commented he was sure they could "pull this thing off."

Rude arrived at the Bellevue location at 3:30 p.m. There he met with appellant and Johnson. This conversation was also recorded in part. At first Rude just spoke with Johnson. Rude asked him if he was ready for the television and said that the place was overloaded. Johnson asked for two speakers, and Rude told him to talk to appellant because he would not be there. When appellant came in the room, Rude told him that he had the keys and the map and gave him directions. Rude gave appellant $100 to rent the truck, the key to the padlock to Storage Unit 20 of the warehouse and a map of the warehouse.

Thereafter, Rude drove appellant to the warehouse at 2480 Bluebell in Santa Rosa. At this point the conversation could not be recorded. Rude testified that he drove to the warehouse and left without stopping. During the ride, Rude told appellant what he had learned about the warehouse's contents, its security and location. He also told appellant about his connections and his ability to market the property in California.

Rude dropped appellant at a house on Trowbridge in Santa Rosa at about 4:30. There he saw a U-Haul truck, appellant's brother, Damon, and Lee in the driveway.

Rude and other deputy sheriffs had arranged that day for storage unit 20 of the warehouse to be stocked with six or eight televisions in boxes, some empty television boxes, and a stereo, which had been loaned from a local businessman and secured by a padlock, also donated. Thereafter, the unit was placed under surveillance.

At about 8:30 p.m., a U-Haul arrived at the storage unit. The truck was driven by Damon Peppars, and accompanying him was Lee. Damon unlocked the padlock and began to hand the merchandise to Lee who was in the back of the truck. Both were arrested while in the process of loading the truck, and the key and padlock were found in Damon Peppars' pocket. Inside the truck, the officers found a rental agreement executed by appellant.

Appellant was arrested on June 3. After being advised of his rights, he agreed to waive them and to speak to the officers. That conversation was tape recorded and played to the jury.

Appellant told the officers that what "actually happened" was that Paul Johnson's friend Roger had hired him to move furniture: "I wasn't aware that this was a burglary being set up or was in progress. I said I was gonna make a few extra dollars just by . . . just by moving . . . moving some furniture." Appellant denied giving Rude a ring to sell for him and when shown a picture of it, he stated that he had never seen it before.

*Defense Case*

The sole defense witness was Darryl Lee. He testified that on June 2 he was helping appellant move his furniture. Appellant did not tell him what he was to move or to where he was to move it, but appellant did promise to pay him for his help. Lee was unaware any crime had been planned or that one was in progress at the warehouse.

*Discussion*

*Entrapment was not established*

The test for entrapment in California is: "was the conduct of the law enforcement agent likely to induce a normally law-abiding person to commit the offense?" (*People* v. *Barraza* (1979) 23 Cal.3d 675, 689-690 [153 Cal.Rptr. 459, 591 P.2d 947]; see also, *People* v. *McIntire* (1979) 23 Cal.3d 742, 745

[153 Cal.Rptr. 237, 591 P.2d 527]; *People* v. *McClellan* (1980) 107 Cal. App.3d 297, 302 [165 Cal.Rptr. 603].) The California Supreme Court has explained in detail this objective test: "For the purposes of this test, we presume that such a person would normally resist the temptation to commit a crime presented by the simple opportunity to act unlawfully. Official conduct that does no more than offer that opportunity to the suspect—for example, a decoy program—is therefore permissible; but it is impermissible for the police or their agents to pressure the suspect by overbearing conduct such as badgering, cajoling, importuning, or other affirmative acts likely to induce a normally law-abiding person to commit the crime. [¶] Although the determination of what police conduct is impermissible must to some extent proceed on an ad hoc basis, guidance will generally be found in the application of one or both of two principles. First, if the actions of the law enforcement agent would generate in a normally law-abiding person a motive for the crime other than ordinary criminal intent, entrapment will be established. An example of such conduct would be an appeal by the police that would induce such a person to commit the act because of friendship or sympathy, instead of a desire for personal gain or other typical criminal purpose. Second, affirmative police conduct that would make commission of the crime unusually attractive to a normally law-abiding person will likewise constitute entrapment. Such conduct would include, for example, a guarantee that the act is not illegal or the offense will go undetected, an offer of exorbitant consideration, or any similar enticement.[4] [¶] Finally, while the inquiry must focus primarily on the conduct of the law enforcement agent, that conduct is not to be viewed in a vacuum; it should also be judged by the effect it would have on a normally law-abiding person situated in the circumstances of the case at hand. Among the circumstances that may be relevant for this purpose, for example, are the transactions preceding the offense, the suspect's response to the inducements of the officer, the gravity of the crime, and the difficulty of detecting instances of its commission. [Citation.] We reiterate, however, that under this test such matters as the character of the suspect, his predisposition to commit the offense, and his subjective intent are irrelevant." (*People* v. *Barraza, supra,* 23 Cal.3d at pp. 690-691.)

In the instant case, the jury was fully and fairly instructed on the defense of entrapment and by its verdict rejected it. Appellant contends that the "facts" show entrapment as a matter of law. We disagree.

While the rare case can be imagined where the evidence is such to warrant the usurpation of the fact finding process[4] by the appellate or trial court with the

---

"[4]There will be no entrapment, however, when the official conduct is found to have gone no further than necessary to assure the suspect that he is not being 'set up.' The police remain free to take reasonable, though restrained, steps to gain the confidence of suspects. A contrary rule would unduly hamper law enforcement; indeed, in the case of many of the so-called 'victimless' crimes, it would tend to limit convictions to only the most gullible offenders."

[4]As noted in *Barraza,* the defense of entrapment is a question for the jury. (*Id.,* 23 Cal.3d at p. 691, fn. 6.)

conclusion that only one reasonable inference can be drawn from the evidence—that is, that the conduct of the law enforcement agent was likely to induce a normally law-abiding person to commit the offense—the evidence in this case does not fall within that category. The trial court properly submitted the issue of entrapment to the trier of fact, and it cannot be said that there is no substantial evidence to support the implied finding of the jury that the conduct of Deputy Rude was *not* likely to induce a normally law-abiding citizen to conspire to commit burglary.

*The conduct of the police was not "sufficiently gross" to warrant the conclusion that the appellant's conviction violates the due process clause*

In *People* v. *McIntire, supra,* 23 Cal.3d at page 748, footnote 1, the California Supreme Court intimated that "[s]ufficiently gross police misconduct could conceivably lead to a finding that conviction of the accused would violate his constitutional right to due process of the law." To date, there has been no case in California which has reached such a conclusion.

The doctrine has been recognized, but not yet applied by the United States Supreme Court: "[W]e may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, . . ." (*United States* v. *Russell* (1973) 411 U.S. 423, 431-432 [36 L.Ed.2d 366, 373, 93 S.Ct. 1637]; but compare *Hampton* v. *United States* (1976) 425 U.S. 484, 489-491 [48 L.Ed.2d 113, 118-119, 96 S.Ct. 1646].)

The defense has been recognized and applied by lower federal courts. (See, e.g., *United States* v. *Twigg* (3d Cir. 1978) 588 F.2d 373, 379-381; *United States* v. *West* (3d Cir. 1975) 511 F.2d 1083, 1085; *United States* v. *Bueno* (5th Cir. 1971) 447 F.2d 903, 905; *Greene* v. *United States* (9th Cir. 1971) 454 F.2d 783, 787; *United States* v. *Prairie* (9th Cir. 1978) 572 F.2d 1316, 1319.) In the federal courts, the defense is distinct from that of entrapment. First, while entrapment presents a question of fact, this defense presents a question of law. (*United States* v. *McQuin* (9th Cir. 1980) 612 F.2d 1193, 1196, cert. den., 445 U.S. 955 [63 L.Ed.2d 791, 100 S.Ct. 1608].) Second, under federal law, this defense is available even though the defendant was "predisposed" to commit the crime. (See *United States* v. *Wylie* (9th Cir. 1980) 625 F.2d 1371, 1377, cert. den., 449 U.S. 1080 [66 L.Ed.2d 804, 101 S.Ct. 863].) Such predisposition is fatal to the defense of entrapment. (*United States* v. *Russell, supra,* 411 U.S. at pp. 432-433 [36 L.Ed.2d at pp. 373-374].) California has explicitly rejected the federal standard for entrapment; the stated purpose of the

entrapment defense in this state is to assure "lawfulness of law enforcement activity." (*People* v. *Barraza, supra,* 23 Cal.3d at pp. 686-692.)

The California Supreme Court in *McIntire* cites *People* v. *Isaacson* (1978) 44 N.Y.2d 511 [406 N.Y.S.2d 714, 378 N.E.2d 78], as an example of police conduct which triggers the due process clause. There, a third person was arrested for possession of a controlled substance and was physically abused by the New York police during interviewing. Later when the officers learned that the substance was not a controlled one, they did not tell him. Instead, he was left under the delusion that he was facing a substantial prison sentence if convicted. He thus agreed to be an informant for the police.

He proceeded to contact various individuals, including an acquaintance Isaacson, in order to set up a drug deal for which the police could arrest the seller. Isaacson, a resident of Pennsylvania with no prior criminal record, initially refused. The informant persisted with stories that he was facing a term in Attica, that the police had beaten him, and that he needed a " 'score' " so that he could hire an attorney. Appellant finally agreed to sell to the informant in a quantity suggested by the police so they could obtain a higher grade of crime. The police also used the informant to lure Isaacson into New York for the sale although Isaacson was unaware that the meeting was set up in that state.

Under these circumstances, the New York Court of Appeal held that the police conduct violated the state's due process clause even though the defense of entrapment had failed by the finding that Isaacson was predisposed to commit the crime. The New York court set forth four illustrative factors to be considered in determining whether due process principles had been violated: "(1) whether the police manufactured a crime which otherwise would not likely have occurred, or merely involved themselves in an ongoing criminal activity [citations]; (2) whether the police themselves engaged in criminal or improper conduct repugnant to a sense of justice [citations]; (3) whether the defendant's reluctance to commit the crime is overcome by appeals to humanitarian instincts such as sympathy or past friendship, by temptation of exorbitant gain, or by persistent solicitation in the face of unwillingness [citations]; and (4) whether the record reveals simply a desire to obtain a conviction with no reading that the police motive is to prevent further crime or protect the populace." (*People* v. *Isaacson, supra,* 378 N.E.2d at p. 83.) Applying these factors, the court found the manufacture and creation of crime, "serious police misconduct repugnant to a sense of justice," a "persistent effort to overcome [Isaacson's] reluctance to commit the crime," and an "overriding police desire for a conviction of any individual." (*Id.,* at pp. 83-84.)

In the instant case, there is no comparable police misconduct. Although the police set up the warehouse, it was appellant who had suggested the idea in the

first place. Appellant was not physically abused, nor was Johnson. There was no reluctance on appellant's part to commit the crime: he was willing from the beginning. Finally, it simply cannot be said that the desire of the police was merely to convict anyone no matter what it took by way of infringement of appellant's or a third party's rights.

In short, the conduct of the police in the instant case simply does not rise to the level of that condemned in *Isaacson*. Due process was not offended by the conviction of appellant of conspiracy to commit burglary.

*The superior court did not err in denying the motion to set aside the information on the ground that the evidence was insufficient to hold appellant to answer on the charge of conspiracy to commit burglary*

■ Appellant contends that the superior court erred in denying his motion to set aside the information on the ground that the evidence was insufficient to hold him to answer to conspiracy to commit *burglary*. In his view, it was factually impossible for appellant to commit a burglary because the police had given their consent to the entry into the warehouse. Appellant therefore posits that the only chargeable crime was conspiracy to commit *attempted burglary*.

■ ■ ■ ■ Federal courts have routinely upheld a conviction of conspiracy to commit a substantive crime although completion of the substantive crime is impossible.[5] (See *United States* v. *Sanford* (9th Cir. 1976) 547 F.2d 1085, 1091-1092 [conspiracy to transport in interstate commerce illegally killed animals in interstate commerce properly charged even though had the scheme been completed, it would not have constituted an offense against the United States]; *United States* v. *Rueter* (9th Cir. 1976) 536 F.2d 296, 298 [conviction of conspiracy to possess hashish with intent to distribute affirmed even though the seller was a Drug Enforcement Administration (DEA) agent and DEA policy prohibited actually providing drugs to the purchasers]; *United States* v. *Dixon* (9th Cir. 1976) 547 F.2d 1079, 1084, fn. 5 [court rejected contention that conspiracy to distribute heroin could not lie where the substance sold was a harmless one]; *United States* v. *Rose* (7th Cir. 1978) 590 F.2d 232, 235-236, cert. den., 442 U.S. 929 [61 L.Ed.2d 297, 99 S.Ct. 2859] [conviction of conspiracy to transport stolen goods in interstate commerce affirmed although the goods were not stolen because the defendants had unknowingly

---

[5] "'Legal impossibility' denotes conduct where the goal of the actor is not criminal, although he believes it to be. 'Factual impossibility' denotes conduct where the objective is proscribed by the criminal law, but a circumstance unknown to the actor prevents him from bringing it about." (*United States* v. *Heng Awkak Roman* (S.D.N.Y. 1973) 356 F.Supp. 434, 438, affd. (2d Cir. 1973) 484 F.2d 1271.)

engaged governmental agents to perform the theft and the transportation]; *United States* v. *Waldron* (1st Cir. 1979) 590 F.2d 33, 34-35, cert. den., 441 U.S. 934 [60 L.Ed.2d 662, 99 S.Ct. 2056] [conviction of conspiracy to transport stolen property in interstate commerce affirmed even though goods were not stolen]; see generally, Annot., Impossibility of Consummation of Substantive Crime as Defense in Criminal Prosecution for Conspiracy or Attempt to Commit Crime (1971) 37 A.L.R.3d 375.)

The reasons for adopting such a rule in California are quite obvious. Completion of the crime of conspiracy does not require that the object of the conspiracy be accomplished. (*People* v. *Robinson* (1954) 43 Cal.2d 132, 140 [271 P.2d 865]; *People* v. *Witt* (1975) 53 Cal.App.3d 154, 169 [125 Cal.Rptr. 653], cert. den., 425 U.S. 916 [47 L.Ed.2d 768, 96 S.Ct. 1518]; *People* v. *Pic'l* (1981) 114 Cal.App.3d 824, 854 [171 Cal.Rptr. 106].) It is a crime separate and distinct from the substantive offense. (§ 182; *Williams* v. *Superior Court* (1973) 30 Cal.App.3d 8, 12 [106 Cal.Rptr. 89].) As the court explained in *People* v. *Williams* (1980) 101 Cal.App.3d 711, 721 [161 Cal.Rptr. 830]: " '[T]he basic conspiracy principle has some place in modern criminal law, because to unite, back of a criminal purpose, the strength, opportunities and resources of many is obviously more dangerous and more difficult to police than the efforts of a lone wrongdoer.' [Citation.] Collaboration magnifies the risk to society both by increasing the likelihood that a given quantum of harm will be successfully produced and by increasing the amount of harm that can be inflicted."

For such reasons, it is well settled in California that a conspiracy conviction will stand even though the defendant is acquitted of the substantive crime. (*People* v. *Hess* (1951) 104 Cal.App.2d 642, 678 [234 P.2d 65]; *People* v. *McNamara* (1951) 103 Cal.App.2d 729, 737 [230 P.2d 411].) It is a short step from that principle to join the federal courts in holding that factual impossibility is not a defense to the charge of conspiracy to commit the substantive crime. Such a conclusion is in harmony with the law of attempt in California: factual impossibility is not a defense to a charge of attempt. (*People* v. *Rojas* (1961) 55 Cal.2d 252, 257 [10 Cal.Rptr. 465, 358 P.2d 921, 85 A.L.R.2d 252]; *People* v. *Meyers* (1963) 213 Cal.App.2d 518, 522-523 [28 Cal.Rptr. 753]; *People* v. *Parker* (1963) 217 Cal.App.2d 422, 428 [31 Cal.Rptr. 716]; *People* v. *Moss* (1976) 55 Cal.App.3d 179, 183 [127 Cal.Rptr. 454]; *People* v. *Wright* (1980) 105 Cal.App.3d 329, 332 [164 Cal.Rptr. 207].)

For these reasons we conclude that factual impossibility is *not* a defense to conspiracy. Therefore, the trial court properly denied the motion to set aside the information.[6]

---

[6]See footnote 1, *ante.*, page 677.

The judgment is affirmed.

Rattigan, Acting P. J., and Christian, J., concurred.