[No. G010486. Fourth Dist., Div. Three. Dec. 19, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
THOMAS R. ANDERSON, Defendant and Appellant.

**COUNSEL**

Thomas R. Anderson, in pro. per., for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Keith I. Motley and Laura Whitcomb Halgren, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**CROSBY, Acting P. J.**—The trial court found attorney and former Alcoholic Beverage Control Investigator Thomas Anderson conspired to violate state liquor laws (Bus. & Prof. Code, § 24079 [transfer of restricted liquor license for consideration in excess of statutory amount]; Pen. Code, § 182, subds. (a)(1), (5)). Anderson argues Orange County was an improper venue, section 24079 is not a criminal statute, and insufficient evidence supports his convictions. We affirm.

I

Dennis Minnock and his wife were sole shareholders in a corporation that operated a Laguna Beach restaurant and obtained an on-sale liquor license May 18, 1984. The corporation sold the restaurant in 1986, but kept the license on inactive status.

In late 1987, Minnock decided to sell the license. He telephoned Harvey Dwork, self-proclaimed "leading expert on transfer of liquor licenses," who advised he might receive more than the $6,000 allowed by law for licenses held less than five years. Sometime later, Anderson entered the picture. In a three-way telephone conversation between the men, Minnock learned a buyer had been found and the price would include a $6,000 payment to the corporation for the license and $9,000 to him as a finder's fee. He was informed the extra payment was a "gray area of the law, but the corporation owned the license and [Minnock] was a separate person [who] could get the $9,000." However, he was warned he "shouldn't bring it up with the [Alcoholic Beverage Control because it] could just slow things down [but] that it's done quite a bit with no problem at all."

Anderson (but not Minnock) signed a document evidencing the understanding: "WHEREAS Dennis Minnock is a Finder of Sellers of alcoholic beverage licenses, [Anderson] does employ [him] as an independent Finder for one of [the defendant's] clients" and "agrees to pay [him] the sum of $9,000.00 upon verification that the license is transferred to Anderson's client." On the other end of the transaction, Anderson signed a "Retainer Agreement" with Tia Juana Management, Inc., providing for a $6,000 payment to Minnock for the license, a $1,500 finder's fee to Dwork,[1] an escrow fee of no more than $500, and an additional $18,650 to Anderson

---

[1] Alcoholic Beverage Control supervisor Leslie Corona testified the department generally questioned finder's fees in excess of 25 percent of the purchase price, although no specific statute or administrative regulation addressed the issue of third party payments. The size of the fee, it seems to us, is less important than the identity of the recipients.

before the close of escrow. In an addendum to this agreement, Anderson "represent[ed] . . . that the License is commonly known as a 'Conditional 7' License, and that upon transfer . . . the only condition to survive . . . is a restriction on the amount of consideration which can be realized upon the sale of the License up to ninety (90) days prior to May 18, 1989. [¶] The sum of $18,560 to be paid by [Tia Juana] to Anderson pursuant to the Retainer Agreement is payment of a 'finder's fee' to ultimately be disbursed to Anderson upon transfer of the License to Client." Excluding a $1,350 Department of Alcoholic Beverage Control (ABC) transfer fee, the total cost of the license was $26,650. The market price for an unrestricted license would have been approximately $43,000.

Minnock received a $9,000 draft dated December 6, 1988, drawn on Anderson's client trust account and another $6,000 routed through escrow. Dwork received a payment of $7,650 in addition to his $1,500 finder's fee. Anderson was paid $2,000.

The court found Anderson guilty of conspiring to violate Business and Professions Code section 24079 (Pen. Code, § 182, subd. (a)(1)) and to "commit an[] act injurious to the public health, to public morals, or to pervert or obstruct justice, or the due administration of the laws" based on the same conduct (Pen. Code, § 182, subd. (a)(5)).[2]

## II

The information detailed the same five overt acts for each of the Minnock counts. They included allegations concerning the Dwork-Minnock-Anderson telephone call and execution of the agreements for the transfer of the license and the payment of more than $6,000. Anderson now complains, "The evidence submitted by the prosecution was void of any proof that any of the overt acts were committed in Orange County. Further the evidence was void of any proof that any conspiracy existed at the time that the alleged overt acts took place."

Anderson's second point is easily scotched. Assuming no agreement was reached until the three-way telephone conversation, the prosecutor proved Anderson, who authored the retainer and finder's fee agreements signed by the principals and wrote the checks, committed acts in furtherance of the conspiracy well after that date.

█ As for the first contention, we agree with the Attorney General that Anderson waived any venue objection by failing to raise the issue below:

---

[2]The information alleged two other conspiracy counts arising out of a separate incident. The court determined much of the prosecution evidence was inadmissible, however; and those counts were dismissed.

"The subject matter jurisdiction of every superior court in California embraces the entire State of California. A California superior court has subject matter jurisdiction to conduct felony trials and to impose sentences for felonies defined by California statutes, as long as the felonies are committed within the state, even though some or all of them may be committed outside of the county in which that court sits. . . . [T]erritorial jurisdiction [i.e., venue] can be [] conferred [by consent of the parties . . . and is a] nonfundamental, waivable aspect of jurisdiction." (*People* v. *Remington* (1990) 217 Cal.App.3d 423, 428-429 [266 Cal.Rptr. 183], internal quotation marks omitted.) According to *Remington,* venue under Penal Code section 777 et seq. is not an element of the offense and an appropriate objection must be raised in the superior court or it is waived. (*Id.* at p. 430.)

In any event, the conspiracy venue provisions are designed to expand, not limit, the number of courtrooms available to try conspirators. A conspiracy may be prosecuted in any county where an overt act has occurred. (Pen. Code, §§ 182, 184.) The Attorney General concedes testimony concerning the location of the various acts was vague. But it is undisputed that the corporate entities were located in Orange County and the license was to be transferred from one Orange County address to another. Telephone conversations listed in the overt act allegations almost certainly had participants in Orange County. This would have been enough to establish venue had a proper objection arisen.

### III

Arguing a violation of Business and Professions Code section 24079 does not constitute a crime, Anderson next faults the trial court for denying his Penal Code section 1118 motion to dismiss. But section 24079 limits "[t]he purchase price or consideration that may be paid by a [liquor license] transferee or received by a transferor" to $6,000 for a period of "five years from the date of the original issuance of the license." Business and Professions Code section 25617 adds, "Every person convicted for a violation of any of the provisions of [division 9] for which another penalty or punishment is not specifically provided for in this division is guilty of a misdemeanor . . . ." Section 24079 is contained in division 9, and no other punishment is prescribed. (Cf. Bus. & Prof. Code, § 24200, subd. (b) [grounds for revocation or suspension of license; not penalty or punishment within meaning of Bus. & Prof. Code, § 25617].)

That should be the end of it, but Anderson contends a statute cannot be classified as penal unless it includes the words "unlawful or illegal." Not so. It has been established for well over a generation that the "Alcoholic

Beverage Control Act was enacted for the purpose of protection of the safety, welfare, health, peace and morals of the people of this state [].” (*Peck's Liquors, Inc.* v. *Superior Court* (1963) 221 Cal.App.2d 772, 781 [34 Cal.Rptr. 735]; see Bus. & Prof. Code, § 23001.) That is enough to suggest penal sanctions were intended.[3]

The Legislature has obviously concluded that speculation in liquor licenses is an evil to be discouraged by including it within division 9. While “common enforcement methods [for violations of the act] are suspension or revocation of the offender's license” (2 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Crimes Against Public Peace and Welfare, § 966, p. 1093), those remedies are simply inadequate to deter lawyers, brokers, and other symbionts who facilitate bootleg sales of licenses. We adopt the reasoning of *Peck's Liquors* and hold a violation of Business and Professions Code section 24079 is a crime.

Anderson's next argument is also impossible to swallow. He claims there was no evidence of the date of original issuance of the license. But he included the date in the addendum to the Tia Juana retainer agreement (“Anderson expressly represents and warrants that [the license] had an original issuance date of May 18, 1984”), and Minnock confirmed it at trial.

The point is essentially irrelevant, however. In a conspiracy the question is not whether the defendant committed the underlying crime; rather, it is “[whether there was] an agreement between two or more persons with the specific intent to agree to commit a public offense . . . followed by an overt act committed in [the] state by one or more of the parties for the purpose of accomplishing the object of the agreement.” (1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Elements of Crime, § 156, p. 173, internal quotation marks omitted.) Anderson does not urge the agreement between Dwork, Minnock, and him contemplated a license transfer after expiration of the five-year period. Nor does he suggest the crime was factually impossible to commit, e.g., that the five-year period had already expired, although they might have believed otherwise.[4] There was substantial evidence the conspirators hoped to close the deal as soon as they could, and certainly well before

---

[3]In *Peck's Liquors* the court held a violation of former Business and Professions Code section 24752 (selling alcohol at less than the agreed contract price) was a misdemeanor. Like section 24079, section 24752 did not use the words “illegal or unlawful.” (See also *Wilke & Holzheiser, Inc.* v. *Dept. of Alcoholic Bev. Control* (1966) 65 Cal.2d 349, 370 [55 Cal.Rptr. 23, 420 P.2d 735], disapproved on another point in *Rice* v. *Alcoholic Bev. etc. Appeals Bd.* (1978) 21 Cal.3d 431 [146 Cal.Rptr. 585, 579 P.2d 476, 96 A.L.R.3d 613].)

[4]This is apparently no defense to a conspiracy charge in any event. (*People* v. *Peppars* (1983) 140 Cal.App.3d 677, 688 [189 Cal.Rptr. 879].) The defendant must intend to commit the unlawful act however, and a defendant may “offer evidence of [] good faith or mistake.” (1 Witkin & Epstein, *supra*, § 164, p. 183.)

May 18, 1989. Why else agree to serve up the license at a substantial discount? Why else tell Minnock not to inform the ABC of the finder's fee arrangement "[because it] could just slow things down." The only reasonable inference was that the conspirators agreed to sell the license in violation of the five-year limitation period.

 Perhaps Anderson's most creative argument is that no criminal objective existed since the corporation was the licensee and the finder's fee went to Minnock as an individual, i.e., that the section can be avoided by the simple expedient of funneling a finder's fee or consideration for the license through a shell or dummy corporation. As the prosecutor explained, "it's a sham to call this a finder's fee. Mr. Minnock testified that he was not in the business of finding liquor licenses, hadn't been before this transaction, hasn't been since, and didn't have any intention of taking up the business at the time. . . . What this really is is additional payment in excess of what the law allows for an immature liquor license that's going to the people that are selling it." He continued, "[i]f people can get large amounts for the sale of these liquor licenses . . . then everybody in the state is going to put their name in for the lottery to get [one] and try and sell it for a huge profit six months later. Well, if all you have to do to avoid this proscription is to form [a] corporation with your wife, apply for the liquor license, get it and then sell the liquor license six months later and take back a quote, unquote, 'finder's fee' to one of you and not to the corporation, well, the whole purpose of the statute is effectively thwarted."

We agree. Business and Professions Code section 24079 limits the "purchase price or consideration that may be paid by a transferee or received by a transferor." The act does not define "transferor," but it is significant that the Legislature used that term instead of licensee (and potential or prospective licensee for "transferee"). Also, the act recognizes no substantive distinction between a corporation and the shareholders who own all of its stock in other instances. For example, Business and Professions Code section 24071 authorizes low-fee license transfers "between corporations whose outstanding shares of stock are owned by the same natural persons, or a licensee may transfer upon compliance with Section 24073 [notice of intended transfer] any license to a corporation whose entire stock is owned by the licensee, or his spouse, or a license may be transferred from a corporation to a person who owns, or whose spouse owns, the entire stock of the corporation, and the fee for transfer of each license is [$50]." Other than the nominal fee, no other requirements are imposed on these transfers. (See, e.g., Bus. & Prof. Code, § 24070.)

Further, as the district attorney argued, Business and Professions Code section 24079 would be thoroughly diluted if we were to condone

Anderson's subterfuge and the Legislature cannot have intended such a result: "[A] statute should not be construed so as to render its provisions ineffective . . . ." (*People* v. *Pieters* (1991) 52 Cal.3d 894, 901 [276 Cal.Rptr. 918, 802 P.2d 420]; see also *Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) Penal statutes are to be read in a commonsense manner to effect their purposes. (Pen. Code, § 4.) ■ Nor may the corporate form be "used by an individual or individuals . . . to perpetrate a fraud, *circumvent a statute,* or accomplish some other wrongful or inequitable purpose[;] a court may disregard the corporate entity and treat the acts as if they were done by the individuals themselves or by the controlling corporation." (9 Witkin, Summary of Cal. Law (9th ed. 1989) Corporations, § 12, p. 524, italics added and omitted; see *H.A.S. Loan Service, Inc.* v. *McColgan* (1943) 21 Cal.2d 518, 523 [133 P.2d 391, 145 A.L.R. 349] ["The corporate entity may be disregarded when it is used to evade the law."]; *Jack P. Meyers, Inc.* v. *Alcoholic Bev. etc. Appeals Bd.* (1965) 238 Cal.App.2d 869 [48 Cal.Rptr. 259] [corporate licensee suspended based on acts of sole shareholder].) ■ The court properly concluded the finder's fee was a sham and Minnock was a "transferor" within the meaning of section 24079. Substantial evidence supports the convictions.[5] (See *In re Andre G.* (1989) 210 Cal.App.3d 62, 65 [258 Cal.Rptr. 127].)

Judgment affirmed.

Wallin, J., and Moore, J., concurred.

---

[5]Anderson raises identical issues in arguing his motion for new trial should have been granted. Based on the above discussion, the motion was properly denied.

In a final attempt to avoid the trial court's conclusion that the finder's fee was a cloak for an illegal overpayment, defendant offers the fanciful idea that the payment was the equivalent of a stock purchase. The superior court rejected the notion, and so do we. Tia Juana bought a liquor license, not a corporation.