[No. B061796. Second Dist., Div. Five. Jan. 8, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
KERMIS T. THOMPSON, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part I, sections B and C, and part II.

## COUNSEL

Thomas T. Ono, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Acting Assistant Attorney General, David F. Glassman and John R. Gorey, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**GRIGNON, J.**—Defendant and appellant Kermis T. Thompson appeals from the judgment after a jury trial in which he was convicted of first degree murder with special circumstances and attempted rape. In the published portion of this opinion, we conclude a defendant may be guilty of attempted rape when the defendant intends to have nonconsensual intercourse with a live victim, but unbeknownst to the defendant the victim is dead. In the unpublished portion of this opinion, we reject defendant's other contentions relating to instructional error and the admissibility of evidence. We affirm.

### PROCEDURAL BACKGROUND

Defendant was charged by information in count I with murder in violation of Penal Code section 187, subdivision (a). It was further alleged the murder

occurred in the commission of an attempted rape and a burglary within the meaning of Penal Code section 190.2, subdivision (a)(17)(iii) and (vii). It was further alleged defendant used a knife in the commission of the offense within the meaning of Penal Code section 12022, subdivision (b). Defendant was also charged in count II with residential burglary in violation of Penal Code sections 459 and 460, subdivision (a) and in count III with attempted forcible rape in violation of Penal Code sections 664 and 261, subdivision (2). Prior felony convictions within the meaning of Penal Code sections 667, subdivision (a) and 667.5, subdivision (b) were also alleged. The prosecution sought the death penalty.

The jury found defendant guilty of first degree murder with the use of a knife and attempted rape. The jury further found the attempted rape special circumstance to be true. The jury found the five-year and one-year prior felony conviction allegations to be true. The jury was unable to reach a verdict on count II and a mistrial was declared as to that count. In the penalty phase, the jury returned a verdict of life without possibility of parole. Defendant was sentenced accordingly with an additional seven years for the five-year prior, the one-year prior and the use-of-a-knife enhancements.

## FACTS

On April 22, 1990, Stephanie Corey Bernstein lived with her cat in the rear ground-floor unit of a four-unit apartment building located at 245-1/2 Third Avenue in Venice. Gary Robertson and Gabriele Morgan lived at 245 Third Avenue in the one-bedroom ground floor unit adjacent to Bernstein. Their bedroom wall was immediately adjacent to Bernstein's kitchen. Bernstein was a writer and editor and frequently worked at home. In the early morning hours of April 23, 1990, Bernstein was apparently wearing eyeglasses and working at her computer in her den. The back door of the apartment was apparently unlocked.

At approximately 12:30 a.m. on April 23, 1990, Los Angeles Police Department Officers Mark Tico and Earl Wright saw defendant sitting on a bicycle and conversing with a second Black male at an intersection approximately eight-tenths of a mile from Bernstein's apartment. The officers observed defendant proceed alone in the direction of Bernstein's apartment. The second Black male proceeded in the opposite direction.

Robertson and Morgan went to bed at approximately 12:40 a.m. on April 23, 1990. Approximately two minutes after they went to bed, they heard screams coming from Bernstein's kitchen. After the screams, they heard scuffling, banging, a man's low voice and a woman's quiet voice. Robertson

ran out the front door to see if he could determine what was going on. He noticed Bernstein's back door was open. Morgan heard something being dragged or pulled across the kitchen floor. She heard a woman screaming and moaning, accompanied by a man's soft, calm voice. At 12:51 a.m., Robertson called 911. Robertson again went outside, and as he approached Bernstein's open back door, he saw the door slowly close.

Officers Tico and Wright received the emergency call at 12:52 a.m. and responded to Bernstein's apartment within 30 to 60 seconds. The two officers were joined at the apartment by two other Los Angeles Police Department officers. The officers entered the apartment and encountered defendant walking down the hallway from Bernstein's bedroom. Defendant was covered with blood and carrying a metal pipe wrapped in brown paper. The zipper on his pants was open. Defendant told the officers "[h]is home-boy just went out the back window." He told the officers the woman in the bedroom had been badly hurt and needed assistance.

The officers discovered Bernstein lying spread eagle on her stomach on her bed. Her pants and underwear had been removed and her blouse and bra had been pulled up to expose her breasts. There were two handprints, one on each side of her buttocks with the fingers pointing in the direction of the anus. There was blood everywhere. Bernstein was dead.

Defendant told the officers he had gone to Bernstein's apartment with his homeboy because they had been told they could obtain drugs and money there. He again stated his homeboy had gone out of the window.

At 2:30 a.m., defendant was observed by two Los Angeles Police Department homicide detectives to have blood all over him. Blood was found on his pants and on his underwear. However, the blood had not soaked through from the pants to the underwear. Defendant also had animal hair all over him and paint chips in his hair. At 4:40 a.m., one of the homicide detectives interviewed defendant and obtained the following statement: Defendant got off work at 9:30 p.m. on April 22, 1990. He ran into his friend, David Jensen. The two men went to Bernstein's apartment to steal narcotics and money. Defendant went into the living room to search for narcotics and money, while Jensen went into the bedroom to attack Bernstein. Defendant heard screaming from the bedroom. Jensen called for defendant to come back and help him. When defendant arrived in the bedroom, Bernstein was on the floor. Defendant helped Jensen pick up Bernstein, who was bleeding but alive, and place her on the bed. In order to make the attack look like rape, the two men pulled down her pants and underwear. Jensen fled through the bedroom window. Bernstein was still alive and breathing when defendant

exited the bedroom and was apprehended by the police. Defendant did not kill Bernstein.

The window in Bernstein's bedroom opened no more than seven and one-half inches and was too small for a person to crawl through. The paint on the window was old and curled, and similar to the paint found in defendant's hair. The animal hair found on defendant was similar to the animal hair found on the comforter in Bernstein's bedroom. Bernstein's eyeglasses were found in the kitchen, bent and bloodied. One of Bernstein's kitchen knives was found on the bed wrapped in Kleenex similar to that found in defendant's jacket pocket. The blood found on defendant's underwear was consistent with Bernstein's blood.

Bernstein died as the result of four stab wounds. One of the stab wounds was a seven-and-one-half-inch wound to the chest just above the sternum. This stab wound cut the right lung, a major vein, and caused a substantial amount of bleeding. This stab wound was "rapidly fatal" and could have caused death to occur immediately or within a few minutes. Bernstein also suffered a three-and-one-half- to four-inch stab wound to the back of the neck, a two-inch stab wound to the cheek and mouth, and a three-fourths of an inch stab wound to the right upper arm. These three stab wounds would ordinarily not have been fatal with proper treatment. All of these stab wounds were consistent with having been caused by the knife found on the bed. Bernstein also suffered numerous other cuts, abrasions, scrapings, and bruises over her entire body. The abrasions were consistent with having been caused by the metal pipe defendant had been carrying. All wounds and bruises had been inflicted immediately prior to death.

At trial, defendant testified: Although he lived only a short distance from Bernstein's apartment, he had stopped to urinate behind Bernstein's apartment when Bernstein came out and asked him what he was doing. He told her it was none of her business and told her to "take her ass" back in the house and mind her own business. Bernstein responded by calling defendant a "nigger." Defendant ran inside Bernstein's house, grabbed Bernstein by the blouse, called her a "bitch" and slapped her across the head, knocking her glasses off. A struggle ensued which moved defendant and Bernstein to the hallway outside the bedroom. Bernstein apologized and defendant relaxed his hold on her. Bernstein kicked defendant in the groin. Defendant picked Bernstein up and threw her through the bedroom doorway onto the bed. Defendant was in tremendous pain and very angry. He saw a knife on the bed and began stabbing Bernstein. While he stabbed her, Bernstein slipped off the bed to the floor. When he was finished stabbing her, he picked her up from the floor and placed her on the bed. He did not know if she was alive

or dead. At this point, he decided to rape her to embarrass her as she had embarrassed him. He pulled down her pants and underwear, but then abandoned the idea. He tried to exit out of the bedroom window, but changed his mind. He pulled out a metal pipe wrapped with a brown paper bag and exited the bedroom only to be confronted by the police. He always carried the pipe for protection. He lied about another person being involved because he was scared.

DISCUSSION

I. *Instructional Error*

A. *Attempted Rape Instruction*

Defendant requested an instruction on attempted rape, which was refused by the trial court. The requested instruction indicated it was not possible for a defendant to attempt to rape a dead body. The instruction read as follows: "The defendant may be found guilty of the crime of attempted rape . . . only if you are convinced that the evidence proves beyond a reasonable doubt that [the victim] was still alive when the defendant first formed the intent to rape her and then did a direct but ineffectual act towards the commission of the crime. If, after considering all of the evidence, you have a reasonable doubt as to whether she was alive at the time of such intent and ineffectual act, then you must find the defendant not guilty of the crime of attempted rape." The trial court concluded the instruction was not a correct statement of the law because if a defendant "believes that the person he is assaulting is alive, he can be found guilty of attempted rape even [if] in fact she's dead."

Defendant contends the trial court prejudicially erred in refusing the requested instruction. Defendant maintains the victim must have been alive at the time the attempted rape commenced in order for defendant to have been convicted of attempted rape. Defendant argues the doctrine of legal impossibility precludes a conviction for attempted rape where the victim is not alive at the time of the attempt. We conclude there is no requirement that the victim be alive for purposes of an attempted rape. We conclude further, that even if the trial court erred in refusing the proffered instruction, any error was not prejudicial.

It is undisputed that the crime of rape requires a live victim, because it requires nonconsensual sexual intercourse. (*People* v. *Kelly* (1992) 1 Cal.4th 495, 524, 526 [3 Cal.Rptr.2d 677, 822 P.2d 385].) It is also clear that in order to be guilty of attempted rape, a defendant must intend to rape a live victim. (*Id.* at pp. 526-527 & 527, fn. 8.) If a defendant intends at all times

to have sexual intercourse with a dead body, the defendant can be guilty of neither rape nor attempted rape. (*Ibid.*) ▮ The question remains as to whether a defendant may be guilty of attempted rape when the defendant intends to have nonconsensual sexual intercourse with a live victim but unbeknownst to the defendant, the victim is dead.

The parties have cited us to and we have discovered no California case directly on point. We conclude, based on analogous authorities and under the circumstances of this case, that impossibility is not a defense to the attempted rape.[1] ▮ "The courts of this state have not concerned themselves with the niceties of distinction between physical and legal impossibility, but have focused their attention on the question of the specific intent to commit the substantive offense. The hypothesis of the rule established in this state is that the defendant must have the specific intent to commit the substantive offense, and that under the circumstances, as he reasonably sees them, he does the acts necessary to consummate the substantive offense; but because of circumstances unknown to him, essential elements of the substantive crime are lacking. [Citations.] It is only when the results intended by the actor, if they happened as envisaged by him, would still not be a crime, then and only then, can he not be guilty of an attempt." (*People* v. *Meyers* (1963) 213 Cal.App.2d 518, 523 [28 Cal.Rptr. 753]; accord, *People* v. *Meyer* (1985) 169 Cal.App.3d 496, 504-505 [215 Cal.Rptr. 352]; *People* v. *Peppars* (1983) 140 Cal.App.3d 677, 687-688 [189 Cal.Rptr. 879]; *People* v. *Siu* (1954) 126 Cal.App.2d 41, 43-44 [271 P.2d 575].)

▮ Thus, an individual may be guilty of attempting to receive stolen property when the property is in fact not stolen. (*People* v. *Rojas* (1961) 55 Cal.2d 252, 258 [10 Cal.Rptr. 465, 358 P.2d 921, 85 A.L.R.2d 252]; *People* v. *Meyers, supra*, 213 Cal.App.2d at pp. 520-523.) An individual may be guilty of an attempted violation of Health and Safety Code section 11104 (one who furnishes chemical precursors to manufactured controlled substances with the knowledge or the intent that the recipient will use the precursor to manufacture a controlled substance), where the recipient is an undercover police officer who will not use the precursor to manufacture a controlled substance. (*People* v. *Meyer, supra*, 169 Cal.App.3d at pp. 503-505.) An individual may be guilty of attempted extortion where the intended victim is not deceived and cooperates with the police. (*People* v. *Camodeca* (1959) 52 Cal.2d 142, 147 [338 P.2d 903].) A defendant may be convicted of attempted pandering even though the house of prostitution does not exist and the women have no intent of accepting an offer to become employees.

---

[1]Accord, Annotation (1971) 37 A.L.R.3d 375, 402 and *United States* v. *Thomas* (1962) 13 C.M.A. 278 [32 C.M.R. 278] (defendants guilty of attempted rape of a woman they believed to be unconscious but who was actually dead).

(*People* v. *Charles* (1963) 218 Cal.App.2d 812, 819 [32 Cal.Rptr. 653].) An individual may be convicted of attempted possession of a controlled substance where the substance is in fact talcum powder. (*People* v. *Siu, supra,* 126 Cal.App.2d 41.) An individual may be convicted of attempted burglary where the owner cooperates with the police and consents to the entry. (Cf. *People* v. *Peppars, supra,* 140 Cal.App.3d at p. 687.)

The discussion of impossibility in the context of attempted rape can be seen in the following examples. If an individual attempts to rape a victim, reasonably believing the victim is alive, the act as intended and envisaged by the actor constitutes the substantive crime of rape. Accordingly, if unbeknownst to the individual the victim in fact is not alive, the individual is nevertheless guilty of attempted rape. On the other hand, if an individual intends to have sexual intercourse with a dead body, the acts as envisaged do not constitute the substantive crime of rape and the individual cannot be guilty of attempted rape.

The proffered instruction erroneously stated the jury must find the victim was still alive at the time defendant formed the intent to rape. It did not correctly state the jury must find defendant intended to rape a live victim. Accordingly, the trial court did not err in refusing defendant's requested instruction.

Even were we to find defendant's proffered instruction constituted a correct statement of the law and the trial court erred in failing to so instruct the jury, we would nevertheless conclude that any error was harmless because the issue was decided adversely to defendant by the jury under other properly given instructions. (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 720-721 [112 Cal.Rptr. 1, 518 P.2d 913] disapproved on other grounds in *People* v. *Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1]; *People* v. *Garrison* (1989) 47 Cal.3d 746, 789-791 [254 Cal.Rptr. 257, 765 P.2d 419].)

The jury was properly instructed that the felony-murder rule required the killing to have occurred during the attempted commission of a rape; the defendant must have had a specific intent to commit rape; the rape must have been committed against the will of the victim; the attempted rape special circumstance required the murder to have been committed while the defendant was engaged in the commission of an attempted rape; the attempted rape could not have been merely incidental to the murder for the special circumstance to be applicable; and, most importantly, the defendant was required to have formed the intent to rape the victim either before or during the infliction of violence, but in any event prior to the time he finished inflicting

violence upon her.[2] The jury convicted defendant of felony murder and found true the attempted rape special circumstance. The jury rejected defendant's statements to the contrary and necessarily determined, therefore, that defendant formed the intent to rape the victim prior to her death. If the intent had not been formed until after her death, the jury was instructed (*People* v. *Kelly*, *supra*, 1 Cal.4th at p. 526) that defendant was not guilty of felony murder under an attempted rape theory.

In addition, the arguments of the prosecutor also correctly explained the relevant law. The prosecutor told the jury that defendant could be convicted of first degree murder solely on a felony-murder theory. The prosecutor conceded there was no substantial evidence of a completed rape because of the absence of sperm in the victim's vagina. The prosecutor told the jury the murder was committed during the commission of an attempted rape only if defendant formed the intent to rape the victim before he entered the apartment or at the latest, prior to attacking her with a knife. The prosecutor specifically told the jury: "Now, if the defendant, once he's inside the house, stabs [the victim] and then decides to rape her, well, then legally, he's not guilty of felony-murder because she's dying already. . . ." He continued: "If you find that once inside the house, he forms the intent to commit the crime of rape, before the decedent dies, before the decedent is attacked, or while the decedent is being attacked, it goes through his mind that he is going to rape her, he is guilty of first degree felony-murder."

---

[2]The jury was instructed in the language of CALJIC No. 8.21, on a felony-murder theory of first degree murder. Specifically, the jury was instructed that first degree murder was the unlawful killing of a human being which occurs during the attempted commission of rape. The jury was further instructed as requested by defendant as follows: "Before you may find the defendant guilty of first degree murder based on the theory that the killing occurred during the commission of the crime of rape or attempted rape, you must find beyond a reasonable doubt that the defendant formed the intent to rape before or during the violence he inflicted upon the victim. If you have a reasonable doubt as to whether the defendant formed the intent to rape before or during the infliction of the violence, then you may not find the defendant guilty of first degree murder on this theory. [¶] In other words, if the defendant did not get the idea to rape [the victim] until after he finished inflicting violence upon her, then he did not kill her during the attempted commission of a rape."

The jury was also instructed in the language of CALJIC No. 10.00 on the elements of attempted rape, including that defendant must attempt to have nonconsensual sexual intercourse against the victim's will "by means of force, violence, or fear of immediate and unlawful bodily injury." The jury was instructed pursuant to CALJIC No. 3.31 that defendant must have had a specific intent to rape. As to the special circumstances allegation, the jury was instructed in the language of CALJIC Nos. 8.80 and 8.81.17 that it must be proved "[t]he murder was committed while the defendant was engaged in the attempted commission of a rape. . . . The murder was committed in order to carry out or advance the commission of the crime of rape or to facilitate the escape therefrom or to avoid detection. In other words, the special circumstance referred to in these instructions is not established if the attempted rape was merely incidental to the commission of the murder."

In light of the foregoing, we conclude the jury necessarily determined that defendant formed the intent to rape the victim prior to her death at his hands.

B., C., II.*

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

DISPOSITION

The judgment is affirmed.

Turner, P. J., and Boren, J., concurred.

A petition for a rehearing was denied January 28, 1993, and appellant's petition for review by the Supreme Court was denied April 1, 1993.

---

*See footnote, *ante*, page 195.