WOOD, P. J.
 

 In six counts of an information, the defendant ivas accused of attempting to receive stolen property in that on six specified dates he did unlaAvfully attempt to buy and receive certain property, to vrit, advance telephone directory supplement, believing that said property had been stolen, and did conceal and Avithhold said property from the owner, Pacific Telephone and Telegraph (Company), believing that said property had been stolen.
 

 Trial by jury was waived. By stipulation, the prosecution’s ease was submitted upon the reporter’s transcript of the preliminary examination. Defendant did not testify. He was adjudged guilty as to the first count, and the other counts were dismissed. Probation was granted upon the condition, among others, that he pay a fine of $500. He appeals from the judgment of conviction, and from the order denying his motion for a new trial. Such order is not appealable
 
 (People
 
 v.
 
 Eppers,
 
 205 Cal.App.2d 727, 728 [23 Cal.Rptr. 222]) and the attempted appeal therefrom Avill be dismissed.
 

 The Pacific Telephone and Telegraph Company prepares and prints, and distributes daily to its telephone information offices in the Los Angeles extended-area, supplements to its telephone directory for that area. The area is divided into six sections or subdivisions. A supplement contains new listings of subscribers Avho have just moved into one of the sections. The listings which are in the supplements appear later in the next directory that is published. The supplements are not available generally to the public and are classified as confidential by the telephone company — the printed words “Confidential Records” are at the tops of the supplements. The supplements are not available for sale to customers. Bach day as new telephones are installed, the telephone company sends copies of the service orders to the printer where, during the nighttime, the supplements for the six sections are printed so that at 8 o’clock the folloAving morning the supplements can be: delivered to the telephone information boards or offices in the respective sections. The employees of the printer have been instructed with respect to the secret and confidential nature of the supplements. The average cost of making a supple
 
 *424
 
 ment for each section is $500. All employees of the telephone company who have access to the supplements are prohibited from making them available to anyone outside the telephone company.
 

 There was evidence to the effect that the supplements might be used for the purpose of telephone solicitation of sales of certain commodities; that persons who engage in the business of soliciting sales by telephone find it advantageous to have information regarding recent “move ins” and, by use of the supplements, to be able to call those persons within a day or two after they have moved into a new residence; that a person who uses telephone solicitation to sell commodities has an advantage over his competitors if he has a telephone list that is not available to his competitors who also solicit sales by telephone.
 

 Mr. Meng and Mrs. Higgs were investigators for the district attorney of Los Angeles. As a part of their investigative arrangements in this matter, he was to be lmown as Mrs. Higgs’ husband (and was to assume the name, Mr. Higgs), and she was supposed to be a telephone operator in the information department of the telephone company. Also as a part of those arrangements, information was conveyed to defendant that Mrs. Higgs was such an employee. About May 1, 1961, defendant called Mrs. Higgs by telephone at her home in Covina, and asked her if she worked for the telephone company. She replied that she worked in the information office. He asked if she knew why he was calling her. She replied that her friend had told her something about it, but she was not sure what it was, and that she would have to discuss it with her husband—and she did not want to get involved in anything illegal. She asked defendant if he would like to meet her and her husband and discuss it. Defendant suggested that she bring her husband to the meeting. They made an appointment to meet the next day, about 2 p.m., at a bowling alley in Baldwin Park. At the appointed time and place she, Mr. Meng (who pretended to be Mr. Higgs), and defendant met and had a conversation wherein defendant said that he wanted to get supplements from the information office, and he would photograph them and return them to her so that she could replace them. He suggested that she work the night shift and that she would be able to remove the supplements and meet her husband outside a door or window and pass the supplements to her husband, who would run them to a place where defendant had set up for a photographer to
 
 *425
 
 take a picture of them, and then the husband, who would be a runner for the scheme, would return the supplements to her. He suggested further that she take the supplements when there were two supplements in a book, that is, that she take them when the supplements “broke,” so that there would be an old supplement and a new supplement in the book at the same time and in that way the new supplements would not be missed. He asked them to keep the matter confidential. He said that the lapse of time from the time the lists were received by him until he returned them would be an hour or an hour and a half, depending on how long it would take to make the photographs. When Mr. Meng asked if this would be against the law, defendant replied that it was not illegal, that he was only borrowing the supplements and they had no value because they were public information. He stated further that if his competitors also had the information, then the lists would not be of any value to him. He said that he would pay her or Mr. Meng $100 for each supplement or $100 a week if she arranged to get six supplements a week for him; that he had a telephone soliciting business; that he did not want to discuss business with them by telephone because he was afraid that his telephone was bugged; that he wanted to pay them in cash because he did not want any checks to be traced as they had been traced in San Francisco. They agreed to do business with him, and he gave them his telephone number.
 

 On May 4, 1961, about 8:08 a.m., Mr. Meng telephoned defendant and said that he had a supplement and would meet defendant at 9 a.m. They met in front of defendant’s office in Sierra Madre where Meng delivered a supplement (Exhibit 1) to defendant, and received from him in exchange therefor five twenty-dollar bills (Exhibit 1-A).
 

 On May 8, about 10 p.m., Meng telephoned defendant and made an appointment to meet him the next morning in Monterey Park. At the appointed time and place, Meng delivered a supplement to defendant and received from him in exchange therefor five twenty-dollar bills.
 

 On May 12th, 16th, and 22d, pursuant to telephone conversations with defendant, Meng delivered supplements to defendant and received from him in exchange for each delivery five twenty-dollar bills. On May 25th Meng delivered two supplements to defendant and received therefor $200.
 

 After each said delivery of a supplement, the defendant photographed the supplement, or caused it to be photo
 
 *426
 
 graphed., and returned it to Meng within an hour or an hour and a half. The supplements, which Meng delivered to defendant, had been given .to Meng by a special agent of the telephone company at the company’s bureau of investigation. The supplements which' Avere delivered to defendant and returned by him, and the money which he paid, were receiA^ed in evidence.
 

 Appellant contends that there AAras no attempt to commit'the crime of receiving stolen property, since he did not have thé specific intent to commit that crime. He argues that the evidence shows only that he intended to make an arrangement Avith a telephone operator Avhereby she Avould get for him, for a money consideration,, confidential telephone directory supplements Avhich he Avould photograph and return to her within approximately an hour; that the telephone operator, in planning to furnish the supplements to him, did not have the intent to deprive the telephone company of property, either temporarily or permanently, and therefore there was no theft; and since the intended acts, if fully carried out, could not amount to receiving stolen property, there could not be an attempt to commit that crime. He argues further that since the supplements involved here were delivered by the company’s special agent to the district attorney’s investigator who delivered them to defendant, the supplements, as a. matter of fact, Avere not stolen from the company and consequently there could not be an attempt to receive stolen propertAL
 

 Section 496 of the Penal Code provides, in part: “Every person who buys or receives any property which has been stolen or which has been obtained in any manner constituting theft . . . knowing the same to be so stolen or obtained .■ . . is punishable by imprisonment. ...”
 

 The supplements herein were property, had value, and Avere the subject of theft within the meaning of said section. (See
 
 People
 
 v.
 
 Dolbeer,
 
 214 Cal.App.2d 619 [29 Cal.Rptr. 573].) The case just cited is similar to the present case. The charge therein was conspiracy to commit, among other crimes, the crime of receiving stolen property, grand theft, and petty theft. In that case this same telephone company had a- similar system in San Francisco for guarding the secrecy of its lists of neAV subscribers in order to .prevent annoyances of the subscribers by solicitors. One of the defendants therein (Lucia) approached an employee of the printing company, which printed the lists or supplements, and pro
 
 *427
 
 posed that the employee provide him with the lists for a money consideration. She (employee) agreed thereto, after having reported the proposal privately to her employer. The telephone company, the police, and the printing company were notified of the proposed plan and they engaged in an extensive surveillance of the operations thereunder. On ten occasions the employee delivered lists, during her lunch hour, to defendant Lucia who caused the lists to be reproduced by a Thermofax machine and returned them during the lunch hour so that they could be replaced with the printing company. He paid the employee $600. It ivas established therein by circumstantial evidence that the other defendant (Dolbeer) was connected with the plan. The defendants therein were found guilty of conspiracy. In that case it was held that the lists were property and had a value.
 

 With respect to specific intent on the part of defendant, in the present case, the evidence shows that he suggested that Mrs. Higgs work the night shift so that she could get the new supplements immediately upon delivery to the information desk, and she could pass them early in the morning to her husband who would be the runner for the scheme; that defendant suggested that she take them immediately upon delivery and while two supplements (the old and the new), were in a book so that the new supplements would not be missed during the hour or more that he was photographing them; that he asked Mrs. Higgs and Mr. Meng to keep the matter confidential and not to discuss it with him by telephone; and that he wanted to make the payments in cash because he did not want checks to be traced. The amount he paid for the supplements indicates that he regarded them as being of substantial value. It thus appears from his secretive and scheming conduct that he was intending to cause the property to be stolen and then to acquire it for himself. Compliance with his scheme or plan, 'by an employee of the telephone company, would have constituted theft of the supplements or property.
 

 It is true that, under the circumstances here where the alleged employee did not comply with defendant’s larcenous scheme, the supplements were not stolen. As above noted, the súpplements were' delivered by the company’s special agent to the prosecution’s investigator who delivered them to the defendant. The evidence herein was’sufficient, however, to show that defendant believed that the supplements had been
 
 *428
 
 stolen, that he intended to receive them under such belief, and that he did receive and pay for them under that belief. The fact that the supplements had been delivered to the inyestigator by the telephone company and were not in fact stolen was an extrinsic fact unknown to defendant. Such unlmown1extSnSc~Sact, however, is not necessarily a basis for a determination that defendant did not attempt to commit the crime which he intended to commit. In
 
 People
 
 v.
 
 Siu,
 
 126 Cal.App.2d 41 [271 P.2d 575], the defendant attempted to purchase narcotics from an officer who delivered to him a package of talcum powder, which defendant thought was heroin. The defendant therein was convicted of attempt to violate section 11500 of the Health and Safety Code. In the
 
 Siu
 
 ease,
 
 supra,
 
 it was said (p. 43) : “Some act done toward the ultimate accomplishment of the intended crime is necessary. [Citation.] But if a person formulates the intent and then proceeds to do something more which in the usual course of naimral’eySfe^ in the commission of a crime, the attempt to commit that crime is complete. And even though the intended crime could not have been completed, due to some' extrinsic fact unknown to the person who intended it/stlíl tie is guilty of attempt.” It was also said therein (p. 44): “. . . Siu intended to commit the crime of possession of narcotics. Delivery to him of what he thought was heroin was a direct, unequivocal act toward commission of the crime of possession. There was, therefore, no error in the "court’s finding that he was guilty of the Crime of attempt.”
 

 In
 
 People
 
 v.
 
 Camodeca,
 
 52 Cal.2d 142 [338 P.2d 903], it was said (p. 147): “One of the purposes of the criminal law is to protect society from those who intend to injure it. When it is established that the defendant intended to commit a specific crime and that in carrying out this intention he committed an act that caused harm or sufficient danger of harm, it is immaterial that for some collateral reason he could not complete the intended crime. Although the law does not impose punishment for guilty intent alone, it does impose punishment when guilty intent is coupled with action that would result in a crime but for the intervention of some fact or circumstance unknown to the defendant.”
 

 In the present case, irrespective of the fact that the supplements were not stolen, the evidence was sufficient to prove that defendant attempted to receive the supplements as stolen property,
 

 
 *429
 
 The purported appeal from the order denying the motion for a new trial is dismissed. The judgment is affirmed.
 

 Fourt, J., and Lillie, J., concurred.
 

 Appellant’s petition for a hearing by the Supreme Court was denied August 14, 1963.