75 Cal.Rptr.2d 40 (1998)
63 Cal.App.4th 1236
The PEOPLE, Plaintiff and Respondent,
v.
Elliot Chunpong KWOK, Defendant and Appellant.
No. A074646.
Court of Appeal, First District, Division Three.
May 13, 1998.
*42 Daniel Byrne, under appointment by the Court of Appeal, San Francisco, for Defendant and Appellant.
Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Senior Assistant
Attorney General, Catherine A, Rivlin and Michael E. Banister, Deputy Attorneys General, for Plaintiff and Respondent.
Certified For Partial Publication.[*]
PHELAN, Presiding Justice.
Elliot Kwok appeals from a final judgment of conviction following jury trial. He claims he could not be found guilty of residential burglary for an entry into the victim's residence where he removed a lock mechanism, took it to a locksmith who made a key which appellant retained, and then returned the lock to its original position. He argues that no burglary was committed because he did not take the lock with the intent permanently to deprive the victim of it. Rather, his intent at time of entry was to commit a felony assault on the victim on a future date. He further argues that even if his conviction of burglary under these circumstances was proper, sentencing on this charge should have been stayed under Penal Code section 654.[1]
We reject his arguments and affirm.[2]

FACTUAL AND PROCEDURAL BACKGROUND

1. Procedural History
A grand jury indictment was filed in Contra Costa County accusing appellant of the attempted murder of Desli L. on March 6, 1995, in violation of sections 187 and 664 (count 1). The indictment also included two counts of first degree burglary of her Walnut Creek residence (count 2 and count 3) in violation of sections 459 and 460, subdivision (a). Count 2 accused him of entering her residence on or about March 6, 1995, with intent to commit false imprisonment, assault with intent to commit rape, and intent to commit murder.[3] Count 3 accused appellant of entering Desli's home on February 24, 1995, with intent to commit theft, false imprisonment, assault with intent to commit rape, and intent to commit murder.
*43 A jury found appellant not guilty of attempted murder, but guilty of the lesser included offense of assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(1)). The jury also found him guilty of both first degree burglaries.
Appellant was sentenced to the mitigated term of two years for the assault. The sentence on the March burglary was stayed pursuant to section 654. With respect to the February burglary, the court imposed a consecutive term of one year and four months. The court imposed a restitution fine in the amount of $1000, ordered appellant to have no further contact with Desli, and pay restitution to her in an amount to be determined by the court. He was given a total of 503 days' credit for time served. A timely notice of appeal was filed.

2. Facts
Appellant and Desli were not strangers when appellant entered her residence and assaulted her. She was a dental hygienist and registered nurse and first became acquainted with appellant during the summer of 1992 while a nursing student at California State University, Hayward. He was her pharmacology instructor. He was also employed as a pharmacist at Kaiser-Permanente in Oakland.[4] Desli testified that she usually sat in the front row of appellant's class and often sensed that he was glancing at her. Although the glances made her uncomfortable, she "just passed it off," and did not believe she had any "reason to think much more about it." On the last day of the course, she thanked appellant for teaching a good class. Appellant then gave her his business card and told her to give him a call if she were ever at Kaiser.
Desli had no further contact with appellant until her graduation party in June 1994, when she asked him to dance after she noticed him sitting by himself. They danced together several more times during the evening and began discussing personal matters. Appellant told her he had been separated from his wife for about two years and that she had moved to an apartment in San Francisco with their two children while he continued to live in Oakland. He said the separation had been difficult for him, and Desli, who was divorced herself, expressed sympathy. In fact, appellant had never been separated from his wife and was living with her and their two children in the family's Oakland home.
At the end of the party, appellant asked Desli if she would like to have dinner with him sometime and she said she would, if he were ever in Walnut Creek. A week or two later, appellant called and said he would be attending a meeting at Kaiser in Walnut Creek and asked if she would like to have dinner afterwards. She told him she was "involved elsewhere" but that if he wanted to have dinner, "that would be fine." She testified that she did not want appellant to think she was "completely available" because she was dating someone else at the time, and also because she was not physically attracted to him and was not interested in him "other than as a friend."
Desli and appellant saw each other two to three times a month between June 1994 and March 1995. They went out to dinner and also had dinner at her residence several times; they occasionally went on walks and visited the stables where she kept her horse. He gave her a number of gifts, including flowers, wine, perfume, a necklace, and a picture of her that he had drawn. Appellant testified that he had a romantic and sexual relationship with Desli. She denied this, however, saying that when he indicated a desire to become more intimate with her, she told him she was not interested in having that kind of relationship.
In January 1995, while appellant was dining at Desli's home, he mentioned that he was very handy and that if she required any household repairs he might be able to help her. She asked him to look at the door between her garage and her kitchen because it was hard to lock; she believed the strike plate needed to be adjusted so it would line *44 up with the deadbolt. After tinkering with the strike plate, appellant asked if he could remove the whole lock. She told him that was not necessary because, as far as she knew, there was nothing wrong with the lock itself; only the strike plate needed to be adjusted. She told appellant she would have it fixed by a friend who was already doing some repairs around her home.
Desli did not have a key to the door between the garage and the kitchen, so it remained unlocked whenever she left her home through the garage. When she was home, however, she always deadbolted the door from the inside. Appellant knew there was no key for this door because once, when he and Desli were leaving the residence through the garage, he pointed out that she had forgotten to lock the door between the garage and the kitchen. She responded that she did not have a key for that door and that it did not need to be locked because the garage door would be closed.
Desli testified that she never asked appellant to make a key for the kitchen door. Although he admitted she had never asked him to have a key made, he claimed that he volunteered to do so and that she did not object. He also claimed that, in late January, she allowed him to copy the code from her garage door opener so he could program one of his old openers, which would allow him to enter her garage to fix the kitchen door when she was not at home. Desli denied she ever gave appellant permission to enter her home when she was not there, either to repair the kitchen door or for any other purpose. She also denied ever giving him permission to have a garage door opener programmed with her code. She did, however, describe an occasion in early February 1995 when appellant had access to her garage door opener outside her presence and thus an opportunity to copy the code.
On February 24, 1995, appellant came to Desli's house when he knew she would be at work and used the garage door opener programmed with her code to enter. He then removed the lock from the kitchen door and took it to a nearby locksmith to have a key made. The locksmith was able to make the key within an hour by using a code machine and information obtained from lock assembly itself. Appellant then returned to the house and reinstalled the lock. He claimed that the day before he removed the lock he left a message on Desli's answering machine informing her that he was going to have a key made the following day, and that the day after the key was made, he left another message telling her it had been done. Desli denied receiving any such messages. Appellant did not leave the key when he reinstalled the lock. Desli testified that when she came home from work on February 24th, she saw nothing unusual about the door.
Appellant and Desli planned to have dinner together on Monday, March 6, 1995, when he was going to help her with a laptop computer she borrowed from him. On Sunday, March 5, however, she left him a telephone message, asking if they could reschedule their dinner to a date later in the week. She told him she had been asked to work that eveningSundayuntil 11 p.m., and because he would probably be in bed by the time she got home, he could call her Monday morning, presumably to discuss their revised dinner plans.
Since early February, before he had the key made, appellant had been planning what he characterized as a "surprise" for Desli. He testified that he planned this "surprise" because she told him he was "always shy" and that he "needed to be more outgoing[,] outrageous." He thought that after the "surprise," which he said would involve hiding in her house and acting like a "ghost" or a "robber," he and Desli would "laugh about it" and "have fun," which might possibly lead to sexual intercourse. He got the idea for the "surprise" when watching the movie True Lies, in which a husband breaks into his wife's hotel room while wearing a disguise and plays some sort of tape to her. Inspired by the movie, in early February he made an audio tape of a character in the movie Beverly Hills Cop II, saying "Shut up. I'm going to kill you," which he thought he might use as part of the "surprise."
When appellant received Desli's telephone message on Sunday, March 5, he thought this would be an opportune time to go forward with his plan. Shortly before he expected *45 her to arrive home from work, he went to her house and entered it using the garage door opener programmed with her code. Apparently he did not need to use the key to get into the kitchen because Desli was not yet inside with the deadbolt locked behind her. He brought with him a duffel bag containing a video camera, a Polaroid camera, a bottle of whiskey, a piece of wire cut from a coat hanger, a flashlight, a can of topical anesthetic spray, the taped dialog from Beverly Hills Cop II, and a condom. Appellant also took considerable pains to prevent his identity from being discovered and to ensure that his surreptitious entry would not be detected before he could spring his "surprise." He wore dark clothing, gloves, and a ski mask and drove a car which Desli had never before seen him drive. He parked the car around the corner from her house, and covered the license plate with an old plate he had in his garage. Because appellant knew that Desli had a part-time housemate, he also rang the door bell before entering the garage to make sure no one was home. After entering the house, he gathered a number of additional items to use in playing out the "surprise," including a pillow, which he stuffed in his sweatshirt to make himself look fat; a large kitchen knife; and a martingale, which is a bridle-like piece of equestrian equipment Desli kept in her garage. In addition, he had a roll of duct tape, a pair of Desli's panty hose, and a pair of her panties.
Although Desli had told appellant she would be working until 11 p.m. Sunday night, in fact, she unexpectedly had to work until 2 a.m. Monday morning. Appellant testified that when she failed to arrive as expected, he fell asleep in a spare room and did not wake up until after 3 a.m. By that time she was already asleep. He then proceeded with the "surprise," the details of which need not be recounted here because they are not relevant to the issues on appeal. Suffice it to say that Desli was, indeed, surprised when appellant climbed onto her bed, put his hands around her neck, and played the tape that said, "Shut up. I'm going to kill you." She woke up, and after a fierce struggle, managed to escape after smashing appellant in the face with her clock radio. She ran to the home of a neighbor, who took her in and called 911. When Contra Costa County sheriffs deputies arrived, they apprehended appellant, who was still lying on the floor in her bedroom.

DISCUSSION

I. There is Substantial Evidence of the Requisite Intent to Support the Conviction of the February 1995 Burglary.
Appellant contends that the burglary conviction based on his February 24, 1995 entry into Desli's residence must be reversed because there is insufficient evidence that he harbored the requisite intent to commit theft or a felony at the time of the entry. When reviewing the sufficiency of evidence to support a criminal conviction, we ask whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (People v. Johnson (1980) 26 Cal.3d 557, 576, 162 Cal.Rptr. 431, 606 P.2d 738.) We view the whole record in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence to determine whether the record discloses substantial evidence. (People v. Lewis (1990) 50 Cal.3d 262, 277, 266 Cal.Rptr. 834, 786 P.2d 892; People v. Johnson, supra, at pp. 576, 578,162 Cal.Rptr. 431, 606 P.2d 738.) "Before a judgment of conviction can be set aside for insufficiency of the evidence to support the trier of fact's verdict, it must clearly appear that upon no hypothesis whatever is there sufficient evidence to support it." (People v. Rehmeyer (1993) 19 Cal.App.4th 1758, 1765, 24 Cal.Rptr.2d 321.)
Because intent is rarely susceptible of direct proof, it may be inferred from all the facts and circumstances disclosed by the evidence. (People v. Matson (1974) 13 Cal.3d 35, 41, 117 Cal-Rptr. 664, 528 P.2d 752; People v. Hopkins (1983) 149 Cal.App.3d 36, 44, 196 Cal.Rptr. 609; People v. Walls (1978) 85 Cal.App.3d 447, 452, 149 Cal.Rptr. 460.) Whether the entry was accompanied by the requisite intent is a question of fact for the jury. (People v. Hopkins, supra, at p. 44, 196 Cal.Rptr. 609.) "Where the facts and circumstances of a particular case and the *46 conduct of the defendant reasonably indicate his purpose in entering the premises is to commit larceny or any felony, the conviction may not be disturbed on appeal." (People v. Nunley (1985) 168 Cal.App.3d 225, 232, 214 Cal.Rptr. 82.)
Appellant's argument that the February entry into Desli's residence was not a burglary is two-fold: First, he asserts that there is no evidence that he "intended to permanently deprive [Desli] of any property when he entered her home on February 24th," and, second, he asserts that, even if he entered with the intent to commit a felony at a later time, that does not constitute "the requisite intent to commit a theft or a felony at the time of the entry...." We address the second argument first.

A. Entry with Intent to Facilitate Commission of Theft or a Felony on a Later Occasion Satisfies the Intent Requirement of Section 459.
Appellant now concedes that "The evidence in this case is clear the February 24th entry was made with the intent to facilitate the later entry," and that the later entry was made "for purposes of committing the assault on [Desli.]" He contends, however, that entry into her residence with the intent to facilitate commission of crimes on a future occasion does not constitute the requisite intent for burglary. In other words, he argues that the February 24th entry was not a burglary because there was no evidence he intended to commit theft or any felony on the same occasion as the entry. Appellant interprets the phrase "enters ... with intent to commit grand or petit larceny or any felony" in section 459 as if it pertains to the time when the target or predicate crime must be committed, rather than to the time when the intent must exist. Appellant cites no authority for his reading of the statute, and, indeed, the phrase "enters ... with intent" has been uniformly construed to mean that the intent to commit the theft or felony must exist at the time of entry, not that the target crime must be committed then and there. (See, e.g., People v. Hill (1967) 67 Cal.2d 105, 119, 60 Cal.Rptr. 234, 429 P.2d 586.) As a practical matter, if the defendant commits, or gives some indication of intending to commit, theft or a felony in a building shortly after entering it, no great inferential leap is necessary to conclude that the intent to commit the supporting offense existed at the time of entry. Thus, temporal or spatial proximity between the entry and the target or predicate crime are factors that may reasonably be considered by the jury when determining whether the requisite intent existed at the moment of entry, but they are not elements of the crime of burglary.
In People v. Wright (1962) 206 Cal.App.2d 184, 23 Cal.Rptr. 734, a case that focused on the issue of spatial proximity, the defendant argued that his entry into a building to gain access to an adjoining bin-like shed (which was not subject to the burglary statute) in order to steal tires was not burglary because he did not intend to steal property from the building itself. (Id. at pp. 185-186, 23 Cal. Rptr. 734.) The court rejected this argument, observing that the defendant was attempting to read the word "therein" into the statute. The court held that, for purposes of section 459, the requisite intent is not limited to an intent to commit the target crime within the building entered. The Wright court explained, a burglary is committed "if the intent at the time of entry is to commit the offense in the immediate vicinity of the place entered by defendant; if the entry is made as a means of facilitating the commission of the theft or felony; and if the two places are so closely connected that intent and consummation of the crime would constitute a single and practically continuous transaction." (206 Cal.App.2d at p. 191, 23 Cal.Rptr. 734.) The Wright test was also applied in People v. Nance (1972) 25 Cal.App.3d 925, 102 Cal. Rptr. 266, where the court held that defendant committed burglary when he entered a gas station in order to flip a switch to enable him to steal gasoline from pumps located outside the structure and in People v. Nunley, supra, 168 Cal.App.3d 225, 214 Cal.Rptr. 82, where the court held that defendant committed burglary when he entered the lobby of an apartment building with the intent to burglarize one of the units.
Like the defendant in Wright who attempted to read the word "therein" into section *47 459, appellant here attempts to read the phrase "on the same occasion" into the statute. He concedes, however, that what he refers to as the "requirements of temporal and physical proximity" were relaxed in People v. Ortega (1992) 11 Cal.App.4th 691, 14 Cal.Rptr 2d 246, in which the court held that one who enters a home to commit extortion is guilty of burglary even though the extortion will not be completed until sometime in the future and at a location other than where the entry took place (id. at p. 693, 14 Cal.Rptr.2d 246). He attempts to distinguish Ortega by asserting "extortion is unique," and argues that "Under the facts of this case, there is no reason to further relax the `immediate vicinity' or `continuous transaction' tests set forth in People v. Wright, supra, 206 Cal.App.2d 184, 23 Cal.Rptr. 734." We agree, as the Ortega court noted, that extortion differs from "the typical theft committed in a burglary" because "in extortion, there is usually a passage of time between the threat and the completed extortion" (People v. Ortega, supra, at p. 695, 14 Cal.Rptr.2d 246). However, there is no principled way to distinguish extortion from other felonies or from larceny, if the facts and circumstances of the case permit a reasonable inference that the entry was made in order to facilitate commission of the subsequent crime, even though the entry and the subsequent crime "may not share the attributes of proximity in time and place." (Ibid.)
As respondent persuasively argues, the "continuous transaction test" and the "immediate vicinity test" invoked by appellant are artifacts of the particular factual contexts of Wright, Nance, and Nunley. The fact that the entry and the intended felony were part of a continuous transaction or that the defendant intended to commit the supporting felony in the immediate vicinity of the building entered describe the crimes in those cases, but not the law as generally applicable when some felony other than a theft from an adjacent area is intended. Even Ortega, which purported to rely on the "continuous transaction" factor of Wright, rested principally on the "facilitation" factor, because the burglary conviction was based on the fact that the defendant entered the victim's room in order to obtain the means of committing extortion, not only at a different place, but also at a later time. Thus, the entry and the planned extortion were not truly a "continuous transaction," if that phrase is taken to mean a temporally seamless event or sequence of events that occurs within a very short period of time. Rather, the entry and the extortion were separate but causally or transactionally related events, the entry having been made to secure the means of committing the later crime.
Here, a jury could reasonably infer from the circumstances of this case that appellant entered Desli's residence with the intent to take steps that would facilitate commission of the subsequent crimes. Given the nature of the "surprise" he planned, it is reasonable to infer that he intended to assault Desli while she was sleeping. Obtaining a key to the kitchen door facilitated the attack, not in the sense that using the key was an integral part of the assault or that it provided the direct means by which the assault was committed, but in the sense that it made appellant's scheme more convenient and less risky for him.
If the jury can reasonably infer from a defendant's conduct and other circumstances of a case that he or she entered a building in order to facilitate commission of theft or a felony, we conclude the defendant need not intend to commit the target crime in the same building or on the same occasion as the entry in order to be guilty of burglary. Here, the burglary conviction is supported by substantial evidence because the jury could reasonably infer from the nature of the "surprise" and the steps appellant took to carry it out that he entered Desli's residence on February 24 with the intent to obtain a key to facilitate the commission of the assault nine days later.

B. Appellant's Acquisition of the Key Was Theft.
As we have noted, appellant also contends that his burglary conviction for the February entry is not supported by evidence that he intended to commit theft. He asserts, "The only event which occurred at [Desli's] house on February 24th was the *48 temporary removal of the door lock" which cannot provide the basis for the crime of theft.[5] He argues there is no evidence that he intended to deprive her permanently of any property. Implicit in appellant's argument is the assumption that making and retaining an unauthorized copy of someone's house key is not theft.
We have found no California authority that specifically addresses the question of whether making an unauthorized copy of a key constitutes theft. However, the Wyoming Supreme Court, construing burglary and theft statutes similar to California's,[6] addressed this question in Dreiman v. State (Wyo.1992) 825 P.2d 758, and concluded that such conduct is theft. We find the Wyoming court's reasoning persuasive.
In the Dreiman case, the defendant entered his former girlfriend's residence and took her personal calendar as well as her house and automobile keys.[7] (825 P.2d at p. 760.) He then made copies of the calendar and the keys and returned the originals to her dwelling. (Ibid.) Defendant argued that he could not be guilty of burglary because he did not have the specific intent to commit larceny by stealing her calendar and keys because he returned those items after he copied them. (Id. at p. 761.) Because his former girlfriend still had her keys and calendar, he argued, they were not stolen but only "borrowed." (Ibid.) The Wyoming Supreme Court rejected this argument, pointing out that while the girlfriend did have her keys and calendar, the defendant had them as well. The court stated, "Copying those keys, therefore, was taking something from her and depriving her of her right to have exclusive access to her trailer house and automobile. [¶] Unauthorized copies of a person's keys diminish the value of the original keyskeeping unwanted persons out of the trailer.... [¶] ... Thus, although the owner may retain possession of the original property, there has been nevertheless a deprivation of property when a copy is made and retained by another. The copies of the car and house keys and the personal calendar constituted sufficient evidence from which the jury could infer that [the defendant] had the specific intent to steal when he unlawfully entered [his former girlfriend's] dwelling." (Ibid.)
In reaching the conclusion that making an unauthorized copy of a key constitutes theft, the Wyoming Supreme Court cited three California cases involving unauthorized copies of documents. (Dreiman v. State, supra, 825 P.2d at p. 761.) In both People v. Parker (1963) 217 Cal.App.2d 422, 31 Cal.Rptr. 716 and People v. Dolbeer (1963) 214 Cal.App.2d 619, 29 Cal.Rptr. 573, the defendants devised schemes for obtaining and copying supplementary lists of new telephone customers which were not generally available to the *49 public and which the telephone company considered confidential. Defendants argued that the lists were not property, but mere information, and that because the original lists were returned after they were copied, there was no specific intent to deprive the telephone company of them permanently and therefore no theft. (Parker, supra, at p. 426, 31 Cal.Rptr. 716; Dolbeer, supra, at p. 622, 29 Cal.Rptr. 573.) Both the Parker court and the Dolbeer court held that the lists were property, that they had value, and that they were subject to theft. (Parker, supra, at p. 426, 31 Cal.Rptr. 716; Dolbeer, supra, at pp. 622-623, 29 Cal.Rptr. 573.) In Williams v. Superior Court (1978) 81 Cal.App.3d 330, 146 Cal.Rptr. 311, attorneys who had illicitly obtained a photocopy of an insurance company's investigative file, of which the insurance company retained the original, were held to have received and concealed stolen property.
None of these cases squarely addressed the question whether obtaining the unauthorized copies was, in and of itself, theft. Rather, they focused on whether the information contained in the documents, as distinguished from the paper on which the information was recorded, was property subject to theft (Dolbeer, supra, 214 Cal.App.2d at pp. 622-624, 29 Cal.Rptr. 573; Williams, supra, 81 Cal.App.3d at pp. 340-342, 146 Cal.Rptr. 311), on whether the information had value (Parker, supra, 217 Cal.App.2d at pp. 425-426, 31 Cal.Rptr. 716), and on whether the copy itself had been taken from the rightful possessor (Williams, supra, at pp. 340-342, 146 Cal.Rptr. 311). While these California cases do not directly support the Wyoming Supreme Court's rationale for concluding that making an unauthorized copy of a key is theft because it deprives the owner of the right of exclusive control, we find authority for adopting this rationale in California's statutory definitions of property and ownership.
Civil Code section 654 provides as follows: "The ownership of a thing is the right of one or more persons to possess and use it to the exclusion of others. In this Code, the thing of which there may be ownership is called property." Thus, property is something that one has the exclusive right to Possess and use. A key to one's residence is clearly one's property. It is beyond dispute that appellant would have been guilty of burglary predicated on theft if he had entered Desli's residence with the intent to take her house key. Even if she retained other copies of the key, appellant's unauthorized possession of the stolen key would impair her right of ownership, i.e., her exclusive right of possession and use. This is so because a homeowner's or tenant's property interest in his or her house key is not just the right to maintain possession of a tangible objectthe keybut also the right to control the intangible benefit conferred by ownership of the key, i.e., the ability to control access to one's residence. "'Courts have said that the word "property" is "all-embracing so as to include every intangible benefit and prerogative susceptible of possession or disposition." [Citations.] [¶] ... [T]he construction of the word "property" ... signifies "any valuable right or interest protected by law." [Citations.]'" (Downing v. Municipal Court (1948) 88 Cal.App.2d 345, 350,198 P.2d 923.) Making an unauthorized copy of a "borrowed" key, Which is analogous to making an unauthorized copy of a trade secret or an unauthorized copy of computer data,[8] destroys the "intangible benefit and prerogative" of being able to control access to one's residence just as thoroughly as outright theft of the key itself.
Here, appellant did not "borrow" a key to make a copy by using the key as a template as did the defendant in Dreiman. Rather, he "borrowed" the lock so a key could be made by using a code machine and the lock cylinder as a template. The fact that appellant used a lock rather than another key as the means of obtaining an unauthorized copy does not affect our conclusion that appellant's acquisition of the key was theft. The result is the same regardless of the precise method used to obtain the illicit copy: appellant obtained a key in which he had no *50 legitimate property interest. Desli, not he, was the rightful owner of the key, even though the key, as a tangible object, did not exist until appellant had it made.
Furthermore, there was ample evidence to permit the jury to infer that appellant intended to deprive Desli permanently of the key. He had it made by entering her residence when she was not there and removing the lock assembly without her permission. He reinstalled the lock in such a way that she unaware that it had been removed. He did not leave the key for Desk' when he reinstalled the lock, and she denied his claim that he informed her that he had had it made for her. The nature of the "surprise" appellant planned and the elaborate steps he took to avoid detection also suggest that he obtained the key for his own purposes, not to give to her. These circumstances are substantial evidence from which the jury could reasonably conclude appellant entered the home on February 24, 1995 with the intent to permanently obtain an unauthorized key to the residence.

II. The Burglary Instruction Was Correct.[**]

III. Section 654 Does Not Bar Imposition of a Separate Sentence for the February 24,1995 Burglary.
We next consider whether imposition of a consecutive sentence for the February 24, 1995 burglary was precluded by section 654. At the time when appellant was sentenced, section 654 provided: "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one; an acquittal or conviction and sentence under either one bars a prosecution for the same act or omission under any other."[9] The purpose of section 654 is to insure that a defendant's punishment is commensurate with his culpability and that he is not punished more than once for what is essentially one criminal act. (See People v. Latimer (1993) 5 Cal.4th 1203, 1211, 23 Cal. Rptr.2d 144, 858 P.2d 611.) Courts have devised various rules for proper application of section 654, but "[b]ecause of the many differing circumstances wherein criminal conduct involving multiple violations may be deemed to arise out of an `act or omission,' there can be no universal construction which directs the proper application of section 654 in every instance." (People v. Beamon (1973) 8 Cal.3d 625, 636, 105 Cal.Rptr. 681, 504 P.2d 905.)
Although section 654 literally applies only where multiple statutory violations arise out of a single "act or omission," it has also long been applied to cases where a "course of conduct" violates several statutes. (Neal v. State of California (1960) 55 Cal.2d 11, 19, 9 Cal.Rptr. 607, 357 P.2d 839; People v. Brown (1958) 49 Cal.2d 577, 591, 320 P.2d 5.) A "course of conduct" may be considered a single act within the meaning of section 654 and therefore be punishable only once, or it may constitute a "divisible transaction" which may be punished under more than one statute. (Neal v. State of California, supra, at p. 19, 9 Cal.Rptr. 607, 357 P.2d 839; People v. Brown, supra, at p. 591, 320 P.2d 5.) Whether the acts of which a defendant has been convicted constitute an indivisible course of conduct is a question of fact for the trial court, and the trial court's findings will not be disturbed on appeal if they are supported by substantial evidence. (People v. Osband (1996) 13 Cal.4th 622, 730, 55 Cal. Rptr.2d 26, 919 P.2d 640; People v. Williams (1992) 9 Cal.App.4th 1465, 1473, 12 Cal. Rptr.2d 243; People v. Goodall (1982) 131 Cal.App.3d 129, 148, 182 Cal.Rptr. 243.)
In what has been characterized as a "judicial gloss" on the language of section 654 (People v. Latimer, supra, 5 Cal.4th at pp. 1211, 1214-1215, 23 Cal.Rptr.2d 144, 858 P.2d 611; People v. Siko (1988) 45 Cal.3d 820, 822, *51 248 Cal.Rptr. 110, 755 P.2d 294), the basic test used for determining whether a "course of conduct" is divisible was stated in Neal as follows: "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (Neal v. State of California, supra, 55 Cal.2d at p. 19, 9 Cal. Rptr. 607, 357 P.2d 839.) Relying on this "one intent and objective" test, appellant argues that his entry into the residence on February 24, 1995, was part of "one indivisible course of conduct" which culminated in the assault nine days later, and that sentencing for the February 24 burglary must therefore be stayed pursuant to section 654, just as it was with respect to the March 5 burglary.
If one looks solely to the language of Neal's "one intent and objective" test, appellant's argument appears to have merit, because it is undisputed that the February burglary was committed in order to facilitate the subsequent crimes. But decisions since Neal have refined and limited application of the "one intent and objective" test, in part because of concerns that the test often defeats its own purpose because it does not necessarily ensure that a defendant's punishment will be commensurate with his culpability. (See People v. Latimer, supra, 5 Cal.4th at p. 1211, 23 Cal.Rptr.2d 144, 858 P.2d 611.) For example, in People v. Beamon, supra, 8 Cal.3d at page 639, 105 Cal.Rptr. 681, 504 P.2d 905, the Supreme Court stated that protection against multiple punishment under section 654 applies to "a course of conduct deemed to be indivisible in time." (Italics added.) The court added in a footnote: "It seems clear that a course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment. [Citations.]" (People v. Beamon, supra, fn. 11, italics added.) Thus, a finding that multiple offenses were aimed at one intent and objective does not necessarily mean that they constituted "one indivisible course of conduct" for purposes of section 654. If the offenses were committed on different occasions, they may be punished separately.
This principle was applied in People v. Williams (1988) 201 Cal.App.3d 439, 247 Cal. Rptr. 200, where offenses committed several months apart were separately punished, even though the first offense was committed in order to facilitate commission of the later offenses. In Williams, defendant burglarized his in-laws' home in order to obtain jewels which he intended to use to pay someone to kill them and their daughter. He then waited several months before attempting to hire a hit man, who was, in fact, an undercover police officer. (Id. at p. 441, 247 Cal.Rptr. 200.) Defendant entered a negotiated plea and was separately sentenced for the burglary and for three counts of soliciting murder. (Id. at pp. 440-441, 247 Cal.Rptr. 200.) He argued that the court erred in imposing a separate sentence for the burglary because it was committed for the purpose of carrying out the other offenses and was therefore part of one course of conduce with one principal objective. (Id. at p. 442, 247 Cal.Rptr. 200.) Relying on People v. Beamon, supra, 8 Cal.3d at page 639, footnote 11, 105 Cal.Rptr. 681, 504 P.2d 905, the Williams court rejected this argument on the ground that the crimes were divisible in time because the burglary was committed several months before the murders were solicited, and therefore imposition of a separate sentence for the burglary was permissible. (201 Cal.App.3d at p. 442, 247 Cal.Rptr. 200.)
Similarly, in People v. Gopal (1985) 171 Cal.App.3d 524, 217 Cal.Rptr. 487, defendant, who had offered a bribe in order to obtain copies of stolen trade secrets, was convicted and sentenced to consecutive terms for bribery and for possession of stolen property. (Id. at pp. 531-532, 549-550, 217 Cal.Rptr. 487.) Emphasizing that the bribery and the possession of stolen property were divisible in time, the appellate court affirmed imposition of the consecutive terms, even though the sole objective of offering the bribe was to obtain the stolen trade secrets. (Id. at pp. 549-550, 217 Cal.Rptr. 487.)
Although appellant concedes that under People v. Beamon, supra, 8 Cal.3d 625, 105 *52 Cal.Rptr. 681, 504 P.2d 905 separate sentencing is permitted for offenses that are divisible in time, he argues that separate sentencing is not required and should not be affirmed here Relying on People v. Bailey (1961) 55 Cal.2d 514, 11 Cal.Rptr. 543, 360 P.2d 39 and People v. Packard (1982) 131 Cal.App.3d 622, 182 Cal.Rptr. 576, appellant contends that in those cases, the court "considered acts which [were] divisible in time" and "applied the prohibition of multiple punishment set forth in section 654." In fact, neither Bailey nor Packard was concerned with the correct application of section 654. Rather, both addressed the question of whether a series of thefts committed over a period of time should be charged as one offense or as multiple offenses. (People v. Bailey, supra, at p. 519, 11 Cal.Rptr. 543, 360 P.2d 39; People v. Packard, supra, at pp. 626-627, 182 Cal.Rptr. 576.) While the test for making this determination, i.e., whether all the thefts were committed pursuant to "one intention, one general impulse, and one plan" (People v. Bailey, supra, at p. 519, 11 Cal.Rptr. 543, 360 P.2d 39), resembles the Neal test for determining whether a "course of conduct" is divisible for purposes of section 654, it is irrelevant here because we are not faced with deciding whether a series of thefts constitutes one offense or multiple offenses. As was noted in In re William S. (1989) 208 Cal.App.3d 313, 317, 256 Cal.Rptr. 64, a more useful test for determining the separateness of alleged multiple burglaries for purposes of section 654 is whether the defendant had the opportunity to reflect after the first entry, and nevertheless entered the premises again.
In In re William S., the defendant entered a home, took several items of property, and departed through the front door, which he left unlocked. He returned several hours later, entered through the unlocked door, took several more items, and again departed. (208 Cal.App.3d 313 at pp. 315-316, 256 Cal. Rptr. 64.) Defendant argued that he committed only one burglary, but that even if he had committed two, he could be sentenced only once because leaving the door unlocked during the first entry evinced a single criminal intent because it was done to facilitate the second entry. (Id. at pp. 318-319, 256 Cal.Rptr. 64.) The court rejected these arguments. It first distinguished the multiple entries in the case before it from a hypothetical case involving multiple entries within a short period of time in order to load a getaway vehicle with different items of loot. (Id. at p. 317, 256 Cal.Rptr. 64.) The latter scenario, it concluded, could be viewed as one continuous course of conduct and one crime. (Ibid.) But the case before it involved two entries made several hours apart, with ample opportunity for the defendant to reflect after the first entry, and therefore the two entries constituted two burglaries. (Ibid.) With respect to the applicability of section 654, the court concluded that separate sentencing was not prohibited because even though defendant claimed he had left the door unlocked during the first burglary in order to facilitate later entry, "[t]he act of unlocking the door was not an element of either burglary," and because the crimes were committed "by means of two distinct and different entries, separated both in time and place, and with the intent to steal entirely different property." (Id. at p. 319, 256 Cal.Rptr. 64.) Significantly, in concluding both that the defendant could be convicted for committing two separate burglaries and that he could be separately sentenced for each without violating section 654, the court noted that "the grave risks of violent confrontation engendered in the initial burglary were repeated in the second," and that, "[t]he second entry doubled the danger of violent confrontation." (In re William S., supra, at pp. 318-319, 256 Cal.Rptr. 64.)
The fact that the defendant had an opportunity to reflect between offenses and the fact that each successive offense created a new risk of harm were also significant factors underlying the decision in People v. Trotter (1992) 7 Cal.App.4th 363, 8 Cal.Rptr.2d 648, where the court affirmed the imposition of consecutive sentences for two assaults on the same victim that occurred approximately one minute apart during a police pursuit. In Trotter, the defendant stole a taxi cab and then fired three shots at a police officer during the ensuing chase. The second shot was fired approximately one minute after *53 the first, and the third shot followed a few seconds later. (Id. at pp. 365-366, 8 Cal. Rptr.2d 648.) Defendant testified that he fired all the shots to avoid being apprehended. (Id. at p. 366, 8 Cal.Rptr.2d 648.) Consecutive sentences for assault were imposed for the first two shots, but sentencing for the third assault was stayed. (Id. at p. 365, 8 Cal.Rptr.2d 648.) Defendant argued he should not have been separately sentenced for the first two assaults because they were part of a single course of conduct and were incidental to one objective. (Id. at p. 366, 8 Cal.Rptr.2d 648.) The court affirmed imposition of separate sentences for the first and second assaults, invoking the rule applied in multiple sexual assault cases, that when a defendant maintains one criminal objective he may be convicted and punished for each successive crime of violence against the same victim. (Id. at pp. 366-367, 8 Cal. Rptr.2d 648; see also People v. Harrison (1989) 48 Cal.3d 321, 337-338, 256 Cal.Rptr. 401, 768 P.2d 1078.)[10] The court also noted that all three assaults were separated by periods of time during which defendant had an opportunity to reflect and to break off his assaultive behavior. (Trotter, supra, at p. 368, 8 Cal.Rptr.2d 648.) Finally, the court noted that the purpose of section 654 is to ensure that the defendants punishment is commensurate with his culpability, and that to find section 654 applicable to the facts before it "would violate the very purpose for the statute's existence, because defendant's conduct became more egregious with each successive shot, and "[e]ach shot posed a separate and distinct risk to [the police officer] and nearby freeway drivers. (Trotter, supra, at pp. 367-368, 8 Cal.Rptr.2d 648.)
Here, appellant's entries into Desli's residence may be said to constitute a "course of conduct" in a broad sense because the first entry was intended at least in part to facilitate the crimes committed nine days later, But it is clearly a "course of conduct divisible time," consisting of separate offenses which may therefore be separately punished, (See People v. Beamon, supra, 8 Cal.3d at p. 639, fn. 11, 105 Cal.Rptr. 681, 504 P.2d 905; In re William S., supra, 208 Cal.App.3d at pp. 318-319, 256 Cal.Rptr. 64; People v. Williams, supra, 201 Cal.App.3d at p. 442, 247 Cal.Rptr. 200; People v. Gopal, supra, 171 Cal.App.3d at p. 550, 217 Cal.Rptr. 487.) Moreover, each entry into the residence created a separate and distinct risk of violent confrontation. Laws against burglary are primarily designed not to deter trespass or the supporting theft or felony intended by the burglar, but rather "`... to forestall the germination of a situation dangerous to personal safety.'" (People v. Gauze (1975) 15 Cal.3d 709, 715, 125 Cal.Rptr. 773, 542 P.2d 1365, quoting People v. Lewis (1969) 274 Cal.App.2d 912, 920, 79 Cal.Rptr. 650; People v. Statler (1985) 174 Cal.App.3d 46, 54, 219 Cal.Rptr. 713.) Because appellant entered the house on two separate occasions nine days apart, the factual situation here is distinguishable from the scenario in which a burglar makes repeated entries in rapid succession. (See In re William S., supra, 208 Cal.App.3d at p. 317, 256 Cal.Rptr. 64; People v. Escobar (1992) 7 Cal.App.4th at 1430, 1437, 9 Cal.Rptr.2d 770.)
Finally, if defendant entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit or each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct. (People v. Beamon, supra, 8 Cal.3d at p. 639, 105 Cal. Rptr. 681, 504 P.2d 905.) Because appellant's intent and objective when he entered the residence on February 24 to obtain a copy of her key was not merely incidental to the assault nine days later, section 654 does not bar separate punishment for that burglary Although having the key might have made carrying out the "surprise" more convenient and less risky for appellant, it was *54 not a necessary or integral part of the subsequent offenses. Having the key did more than smooth the path to the assault: it give him general access to the residence, an obje
ctive much broader than any plans he may have had to use the key to facilitate carrying out his "surprise." We conclude that the February 24th entry with intent to commit theft, i.e., to obtain an illicit copy of the key, was a separate offense that was separately punishable.

DISPOSITION
The judgment is affirmed.
PARRILLI and WALKER, JJ., concur.
NOTES
[*] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II of the Discussion.
[1] All statutory references are to the Penal Code, unless otherwise noted.
[2] In the unpublished portion of this opinion we also reject his claim that the jury instructions as to this burglary charge were erroneous.
[3] Appellant actually entered Desli's residence on March 5, 1995 and assaulted her in the early morning hours of March 6.
[4] At the time of the assault, he was the chief pharmacist and manager of the pharmacy department at Kaiser in Oakland.
[5] More precisely, the temporary removal of property cannot provide the basis for the crime of theft by larceny. Section 484, subdivision (a), defining theft, was amended in 1927 to merge the formerly separate crimes of larceny, embezzlement and false pretenses into the general crime of theft. This merger did not, however, change the elements of the former crimes, some of which, like false pretenses, do not require the intent to permanently deprive the owner of his property. Under section 490a, the term "theft" must now be substituted for the word "larceny" in the burglary statute, and therefore one may have the intent to commit theft requisite for burglary without the intent to permanently deprive an owner of his property if the theft is other than theft by larceny. (People v. Dingle (1985) 174 Cal.App.3d 21, 29-30, 219 Cal.Rptr. 707.)
[6] Wyoming's burglary statute (Wyo. Stat. Ann. § 6-3-301) provides in pertinent part that one who enters a building "with intent to commit larceny or a felony" is guilty of burglary. Wyoming's larceny statute (Wyo. Stat. Ann. § 6-3-402) provides in pertinent part that one who "steals, takes and carries, leads or drives away property of another with intent to deprive the owner or lawful possessor" is guilty of larceny.
[7] He also copied down her unlisted phone number, her social security and insurance policy numbers, and took a photograph of the woman's new boyfriend, photos of her children, and some letters that he, the defendant, had written her. (Dreiman v. State, supra, 825 P.2d at p. 760.) The court stated that the information he copied was also property subject to theft. (Id. at pp. 761-762; see also Collins v. State (1997) 113 Nev. 1177, 946 P.2d 1055, 1059-1060 [copying access code to storage unit is theft].) Oddly, both the defendant and the state glossed over the fact that the defendant had not simply copied down information as well copying the calendar and keys, but had also actually stolen the photos and letters. (Dreiman v. State, supra, at p. 762.)
[8] Making an unauthorized copy of a trade secret is a form of theft prohibited by section 499c, subdivision (b)(3). Making an unauthorized copy of computer data is a form of theft prohibited by section 502, subdivision (c)(2).
[**] See footnote *, ante.
[9] In 1997, section 654 was amended to read in pertinent part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other." (Stats. 1997, ch. 410, § 1.)
[10] The analysis found in multiple sexual assault cases like People v. Harrison, supra, 48 Cal.3d at pages 337-338, 256 Cal.Rptr. 401, 768 P.2d 1078 was also adopted in People v. Washington (1996) 50 Cal.App.4th 568, 57 Cal.Rptr.2d 774, in which the court followed the underlying reasoning of In re William S., supra, 208 Cal.App.3d 313, 256 Cal.Rptr. 64, albeit questioning the need for the "opportunity to reflect" test in light of Harrison. (Washington, supra, at pp. 575-578, 57 Cal. Rptr.2d 774.)